CLERK'S OFFICE U.S. DISTRICT COURT
AT ROANOKE VA. - FILED

SEP 2 6 2008

JOHN F. CORCORAN, CLERK
BY: _____ DEPUTY CLERK

### IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF VIRGINIA

### ROANOKE DIVISION

| | | |
|---|---|---|
| **CHARLES DOUGLAS RINER,** | ) | **Civil Action No. 7:07-cv-00455** |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **MEMORANDUM OPINION** |
| | ) | |
| **LISA EDWARDS, WARDEN,** | ) | **By: Hon. James C. Turk** |
| **Respondent.** | ) | **Senior United States District Judge** |

Petitioner Charles Douglas Riner, a Virginia inmate proceeding pro se, brings this action as a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254. Riner stands convicted in the Circuit Court for Wise County of first degree murder, arson, and petit larceny in connection with an August 1998 house fire that killed his wife, Denise. (Case No. F00-265). The court sentenced him to a total of 35 years imprisonment for these offenses. In his § 2254 petition, Riner asserts that he is confined in violation of the Constitution of the United States, pursuant to his convictions for murder and arson. The respondent filed a motion to dismiss, and Riner responded, making the matter ripe for the court's consideration.[1] Upon review of the record, the court concludes that as Riner is not entitled to relief under § 2254, the motion to dismiss must be granted.

## I. THE EVIDENCE AT TRIAL

In its September 2004 opinion upholding the petitioner's convictions on direct appeal, the Supreme Court of Virginia summarized the evidence, taken in the light most favorable to the Commonwealth, as follows:

---

[1] Riner has also filed several motions in this case, seeking to add exhibits, obtain court appointed counsel, and develop new evidence. The court will address these requests in conjunction with the claims to which they relate. For reasons stated herein, the court will grant the motion to expand the record to include Riner's submitted exhibits, but will deny all of Riner's other motions.

1

## A. The Fire

In the early morning hours of August 12, 1998, Larry Odle, who lived next to the Riners in the Town of Coeburn in Wise County, saw flames coming from the Riner house. Odle walked outside to investigate the fire and observed a "shadow or reflection . . . peek around the [left] corner" of the Riner house three or four times. A person then emerged from that corner and yelled "help, help, my house is on fire." Odle returned to his house and called the "911" emergency number. He then went back to the site of the fire and saw Riner walk from the same left corner of the burning house carrying two of the Riner children.

One of the first three police officers to arrive at the scene stated that, when he got there, the fire was "basically still in the lower part of the house . . . and it was crawling across the [front] porch area and coming out the other side where the top part of the house was on fire." When that officer exited his police vehicle, he observed Riner and two small children coming around the left corner of the house. The officer approached Riner and asked if anyone else was in the home. Riner did not respond and, in the officer's opinion, "[s]eemed surprised that someone was there." The officer repeated his question, but Riner again did not answer. Only after two of the officers approached the burning house did Riner inform the third officer that his wife was still inside their home. Two of the officers then kicked opened a door on the rear of the house, but they could not go inside more than two or three feet because of the intense smoke and heat.

The fire consumed the second floor and roof of the Riner house as well as the front porch, including the floor and the "uprights" of the porch. There was also extensive damage throughout the interior of the first floor, including the master bedroom where Denise's body was found. There and elsewhere on the first floor of the house, fire investigators discovered piles of paper that had been torn apart lengthwise. Some of the torn paper came from correspondence or publications belonging to Riner.

According to the forensic pathologist who performed an autopsy on Denise's body, Denise died from smoke inhalation, which is determined by looking in the airways for "soot" and "black material" and measuring the carbon monoxide level in the blood. The forensic pathologist stated that Denise's body had been "incinerated." Her skin, muscles, facial features, scalp, arms and legs had been burned. Because of the extensive burning of her body, the forensic pathologist could not determine whether Denise had suffered other injuries or had been rendered unconscious by some other trauma before her death. However, the forensic pathologist did not find any evidence of blunt force or penetrating injuries to Denise's body. Although a partially burned baseball bat was found near her body, the forensic pathologist could not put that bat "in or on the body."

On the night of the fire, Riner claimed that he was upstairs, asleep in a room with the three Riner children. However, the family's housekeeper testified that she did not remember anytime that all three children had slept upstairs or in the same bed with Riner. Riner also admitted that the children normally slept downstairs in a bed with Denise.

Riner testified that, when he awoke and smelled smoke, he looked toward the rear of the house and saw smoke coming up the steps. He stated that the smoke was so intense that he could barely breathe and that his eyes were burning so badly that he

2

could not see. However, he was able to find the three children, help them out a window onto the rear porch roof, and then lower them to the ground. Although Denise died from smoke inhalation, Riner did not have any symptoms consistent with carbon monoxide intoxication or carbon monoxide poisoning upon examination at a local emergency room on the morning of the fire. The forensic pathologist testified that, if smoke from a fire is very dense, a person could breathe in a lethal level of carbon monoxide within seconds. Additionally, a nurse who checked Riner in the emergency room did not observe any soot on him or smell any smoke about his body. Riner did, however, have a low oxygen level based on an arterial blood gas study, which was consistent with a sudden or acute injury to his airway from inhaling smoke.

## B. Riner's Activities Prior To And After The Fire

Two issues caused recurring disagreements between the Riners during their marriage. One of those issues concerned Riner's discipline of Denise's son by her previous marriage. In the early part of August, 1998, Denise learned that Riner had choked and slapped her son at a family reunion. That incident exacerbated the Riners' already existing marital difficulties, causing Denise to meet with an attorney on August 4 to obtain information about divorce proceedings. The next day she opened a checking account in her own name. On August 7, she confronted Riner with her knowledge about his abuse of her son and demanded that he move out of the marital residence. Riner apparently agreed to move on the following weekend, which would have been the weekend immediately after the fire. However, he told one of the fire investigators that Tuesday night, August 11, 1998 [the fire occurred during the early morning hours of August 12, 1998], was to be his last night in the marital home.

The other subject causing disagreement was the couple's financial condition. Within a week after the Riners were married in 1990, Riner quit his job. Throughout the marriage, Denise, a nurse, provided the primary financial support for the family.

By mid-1998, Riner had pressing financial difficulties. He had incurred several substantial debts and was delinquent in some of his financial obligations. In particular, Riner had agreed to make restitution in the amount of approximately $5,400 by October 1998 as a condition of probation in a federal pre-trial diversion program in which he was participating. Due to his failure to pay the restitution as scheduled, Riner still owed about $2,900 as of June 1998 and was therefore facing the possibility of being prosecuted on federal bank fraud charges. In fact, he was scheduled to meet with his federal probation officer on August 12, 1998, the day of the fire. The probation officer had also learned that Riner had two outstanding criminal charges, one a misdemeanor and one a felony, for having issued two checks for which there were insufficient funds to pay the checks.

After Denise's death, Riner collected approximately $8,500 from Denise's employer and then paid the restitution in full. Riner insisted, however, that he paid the federal restitution with money he had received from selling two vehicles. He also paid the indebtedness owed to a local merchant for the two checks that were returned for insufficient funds.

Riner also filed two insurance claims. One was a fire insurance claim in the amount of $186,820.24, of which the sum of $116,453.00 was for personal property. The second claim was on a group life insurance policy provided to Denise by her

3

employer. In anticipation of receiving funds from those claims, Riner purchased a used Mercedes automobile by borrowing $9,000 on a 30-day single payment note. He also relocated himself and the three Riner children to eastern Tennessee and made an offer to purchase a house there for the price of $169,000.

The day before the fire, a neighbor observed Riner storing three trash bags in a building located apart from the Riner house. In March, 1999, Riner sold jewelry at a pawn shop located in Bristol, Tennessee. Denise's sisters subsequently accompanied a police officer to the pawn shop and identified three rings found there as belonging to Denise. The rings were part of the jewelry Riner sold, and the Commonwealth introduced evidence showing that the rings would have been damaged or destroyed if they had been in the Riner house during the fire. One of the rings came from Denise's great-grandmother. Another ring was a diamond anniversary band that Denise wore daily and was, in fact, wearing on the day prior to her death. The third ring was a pearl ring that Denise had received as a birthday gift from her co-workers at her place of employment.

### C. Riner's Arrest

In November, 1999, Riner told his employer and personnel at his children's schools that he and the children would be traveling to Pennsylvania to attend a funeral. Instead, Riner spent about 19 days traveling around to different destinations in the United States and then flying to Panama. The flight out of the country occurred at a time when the police investigation into the fire and death of Denise was nearing completion and Riner remained a prime suspect. In fact, Riner was indicted for first degree murder and arson on January 18, 2000.[2] Riner was arrested in Panama on January 21, 2000. At that time, he had in his possession clothes, documents, and luggage that had been in the house prior to the fire.

Riner v. Commonwealth, 601 S.E.2d 555, 559-61 (Va. 2004) (footnote in original). Of course, in

the progression of the trial that lasted more than three weeks, Riner presented extensive testimony

and evidence in an attempt to paint a very different version of events. He asserted then, as he does

now, that he did not set the fire or kill his wife, but was instead merely a victim of an accidental fire

that left his wife dead of smoke inhalation and destroyed his home.


## II. PROCEDURAL BACKGROUND AND HABEAS CLAIMS

Riner pleaded not guilty to the charges of capital murder, arson, and robbery in the

superceding indictment. He was represented at trial and on appeal by two court-appointed attorneys,

Roger D. Groot and Thomas R. Scott, Jr. After a lengthy trial in October and November 2000, a jury

---

[2] A September 1, 2000 superseding indictment charged Riner with capital murder, arson, and robbery.

4

found him guilty of first degree murder, arson, and petit larceny. The jury recommended and the court imposed sentences of thirty-five (35) years imprisonment for the murder conviction and twenty (20) years for the arson conviction with the sentences to run concurrently with each other. The Court of Appeals of Virginia (Record No. 2260-01-3) affirmed his convictions and sentences in a published opinion dated May 6, 2003, Riner v. Commonwealth, 579 S.E.2d 671 (Va. App. 2003). Riner appealed this decision to the Supreme Court of Virginia (Record No. 031299), which affirmed his convictions and sentences in a published opinion dated September 17, 2004, Riner, 601 S.E.2d 555. The court later summarily denied his petition for rehearing by order dated November 17, 2004.

Riner, with new counsel, filed a petition for a writ of habeas corpus in the Circuit Court for Wise County on November 16, 2005. Riner v. Edwards, Case No. L05-294. The circuit court dismissed the petition by order dated August 25, 2006. Riner then appealed to the Supreme Court of Virginia, which denied his petition for appeal and his petition for rehearing. (Record No. 062446). With state court remedies exhausted, Riner filed this federal petition under § 2254 on or about September 21, 2007.

In his § 2254 petition, Riner alleges the following grounds for relief:

1.    The evidence of arson was insufficient to support petitioner's conviction;

2.    Petitioner's detention is unlawful because of the admission of, and participation by, a private prosecutor;

3.    Petitioner's detention is unlawful because Juror Gibson's misconduct deprived him of a fair trial;

4.    Petitioner's detention is unlawful because the court improperly admitted highly prejudicial, hearsay statements;

5.    Petitioner's detention is unlawful because the court denied petitioner's motion for change of venue and a "joint change of venue motion"; and

6.    Petitioner's trial counsel provided ineffective assistance in that:

    a.    counsel filed ineffective pretrial motions concerning prosecutorial misconduct and other issues;

    b.    counsel failed to preserve objections regarding prosecutorial misconduct in the closing argument;

5

c.      counsel failed to pursue and preserve issues related to prosecutorial vindictiveness;

d.      counsel failed to preserve issues regarding the trial court's erroneous ruling on his request for change of venue;

e.      counsel failed to preserve issues relating to the trial judge's refusal to recuse himself;

f.      counsel failed to preserve the issue relating to the double hearsay;

g.      counsel failed to preserve issues relating to the improper comments of the trial judge;

h.      counsel failed to object to the composition of the jury following the removal of the juror Gibson; and

i.      trial and appellate counsel were ineffective in failing to preserve the issues enumerated as claims B through G in the circuit court's order denying his petition for habeas corpus.

## III. OPINION OF THE COURT

### A. STATUTE OF LIMITATIONS

A person in custody pursuant to the judgment of a state court generally has one year from the date on which his conviction becomes final in which to file a petition for a writ of habeas corpus pursuant to § 2254. See 28 U.S.C. § 2244(d)(1), as amended by the Anti-terrorism and Effective Death Penalty Act (AEDPA) of 1996.

The limitation period shall run from the latest of–
(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

§ 2244(d)(1)(A - D). The statutory period is tolled during periods when "a properly filed application for State post-conviction or other collateral review" is pending. § 2244(d)(2). A petitioner must

6

demonstrate either the timeliness of his petition pursuant to § 2244(d) or that the principle of equitable tolling applies in his case. See Hill v. Braxton, 277 F.3d 701, 705 (4th Cir. 2002); Harris v. Hutcherson, 209 F.3d 325 (4th Cir. 2000).

### 1. Riner's Initial Petition

The court conditionally filed Riner's § 2254 petition by order entered September 27, 2007, notified him that it appeared to be untimely filed, and granted him an opportunity to submit additional information or argument concerning its timeliness. Hill, 277 F.3d at 707 (requiring court to inform petitioner of § 2244(d) limitations and grant opportunity for response before summarily dismissing § 2254 petition as untimely filed). Riner then offered extensive documentation in support of his assertion that he deposited his § 2254 petition in the prison mail system on September 21, 2007. See Houston v. Lack, 487 U.S. 266, 276 (1988) (finding that prisoner's appeal from denial of habeas relief was considered filed on day he delivered it to prison officials for mailing to the court). Counsel for respondent indicates in the motion to dismiss, Footnote 2, that he has confirmed the accuracy of Riner's submissions on timeliness. Counsel also concedes that assuming Riner placed the petition in the prison mail system on September 21, 2007, the petition was timely filed under 28 U.S.C. § 2244(d)(1)(A).

Riner's conviction became final on November 15, 2005, when his 90-day opportunity to file a petition for a writ of certiorari in the United States Supreme Court expired. Sup. Ct. R. 13(1). The federal filing period under § 2244(d)(1)(A) then began to run. After 274 days of the period had elapsed, Riner tolled the period by filing his state habeas petition on November 16, 2005. When the Supreme Court of Virginia denied his petition for rehearing by order dated June 22, 2007, the federal filing period began to run again. Assuming that Riner deposited his § 2254 petition in the prison mail system 91 days later, on September 21, 2007, and subtracting the time when the state habeas petition was pending, Riner "filed" his petition exactly 365 days from the date on which it became final. As the respondent does not dispute the date of mailing or rely on a statute of limitations defense, the court will consider Riner's initial § 2254 petition as timely filed under § 2244(d)(1)(A).

7

## 2. Riner's Later Submitted Claims

In his response to the motion to dismiss in this case, Riner argues several grounds for relief that he did not present in his initial § 2254 petition filed September 21, 2007. He has not moved to amend his petition to raise these additional claims. However, as Riner is not represented by counsel in this action, in the interest of justice, the court will construe his response as an amendment to the extent that it raises new claims. See Haines v. Kerner, 404 U.S. 519, 520 (1972) (court must hold pleadings filed by a pro se litigant "to less stringent standards than formal pleadings drafted by lawyers"); Gordon v. Leeke, 574 F.2d 1147, 1151 (4th Cir. 1978) (same). Claims raised in an amendment to a pending § 2254 petition are subject to the limitation period set forth in § 2244(d)(1). Mayle v. Felix, 545 U.S. 644, 662 (2005). Rule 15(c) of the Federal Rules of Civil Procedure provides for the relation back of late amendments to the timely filed, original petition when "the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth . . . in the original pleading."[3] Fed. R. Civ. P. 15(c)(1)(B). Thus, even when a proposed amendment is not otherwise timely under the provisions of § 2244(d)(1), individual claims in the amendment will relate back to petitioner's timely filed claims "[s]o long as the original and amended petitions state claims that are tied to a common core of operative facts." Mayle, 545 U.S. at 663 (applying Rule 15(c) to habeas amendment). The fact that the claims in the timely filed initial petition and the amended claims all relate to the same trial and sentencing proceedings is not sufficient to support relation back under Rule 15(c)(1)(B). Id.; United States v. Pittman, 209 F.3d 314, 318 (4th Cir. 2000) (finding that petitioner's claims in late amendment "did not relate back to his original [§ 2254] claims because they [arose] from separate occurrences of both time and type") (quotations omitted). Where a late amendment does not relate back under Rule 15(c) to a timely filed claim, the amendment is futile and may be denied. Pittman, 209 F.3d at 317.

---

[3]Rule 11 of the Rules Governing Section 2254 Cases provides that such proceedings are governed by the Federal Rules of Civil Procedure "to the extent that [the civil rules] are not inconsistent with any statutory provisions or [the habeas] rules." See also Fed. R. Civ. P. 81(a)(2) (noting that the civil rules "are applicable to proceedings for . . . habeas corpus.").

Any new claims Riner presents for the first time in his response to the motion to dismiss are untimely filed under § 2244(d)(1)(A). As stated, his one-year limitation period under this section expired on September 21, 2007. He did not sign and date his response to the motion to dismiss until January 25, 2008. The court's initial filing order of September 27, 2007, put Riner on notice of the limitation period and the need for him to provide to the court any evidence or argument related to timeliness of his claims under § 2244(d). Thus, unless his allegations or the record demonstrate a basis on which each of the new claims would be timely filed under one of the other subsections of § 2244(d)(1), or a basis on which each claim relates back to a timely filed claim, the court will summarily dismiss the claims found in Riner's response as untimely amendments. The court will address these claims in the order in which they appear in Riner's response.

## B. STANDARDS OF REVIEW

To the extent that the Virginia courts adjudicated Riner's claims on the merits, this court is bound to follow the deferential standard set forth in 28 U.S.C. § 2254 as amended by the AEDPA. This section reads:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A state court adjudication is "contrary to" clearly established federal law if the state court "applies a rule that contradicts the governing law set forth in [the United States Supreme Court's] cases" or "confronts a set of facts that are materially indistinguishable from a decision of the Court and nevertheless arrives at a result different from [its] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000). A state court decision unreasonably applies Supreme Court precedent if the state court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case," id. at 407-408, or "was unreasonable in refusing to extend the governing

9

legal principle to a context in which the principle should have controlled." Ramdass v. Angelone, 530 U.S. 156, 166 (2000) (opinion of Kennedy, J.). Under § 2254(d)(1)'s unreasonable application clause, a federal habeas court may not grant relief "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams, 529 U.S. at 411. A Virginia court's ruling cannot be deemed unreasonable merely because it does not cite established United States Supreme Court precedent on an issue, even if the court is unaware of such precedent, "so long as neither the reasoning nor the result of the state-court decision contradicts" such Supreme Court precedent. See Mitchell v. Esparza, 540 U.S. 12, 16 (2003).

The Virginia courts dismissed several of Riner's habeas claims under state procedural rules. When a state court has declined to consider the merits of a constitutional claim on the basis of an adequate and independent state procedural rule, a federal habeas court may not review the merits of those claims, absent a showing of cause and prejudice or a demonstration that failure to consider the claim will result in a miscarriage of justice. Harris v. Reed, 489 U.S. 255, 262 (1989). Other claims Riner presents in his submissions to this court were never squarely presented to the state courts for consideration as required under § 2254(b)(1). If state court review of such claims would now be barred under independent and adequate state procedural rules, federal review of the new claims is also barred, absent a showing of cause and prejudice or miscarriage of justice. Gray v. Netherland, 518 U.S. 152, 162 (1996). Riner argues that he can show cause and prejudice or miscarriage of justice to circumvent the state procedural bars imposed against some of his claims. The court will defer addressing these arguments, however, until after it has addressed the claims that the state court adjudicated on the merits. Because Riner has no state court remedies available as to any of his current claims, however, his claims are exhausted as required under § 2254(b).

In addition to the deference mandated by § 2254(d), § 2254(e)(1) requires a federal reviewing court to presume that the state court's determination of a factual issue is correct unless the petitioner offers "clear and convincing evidence" rebutting that determination. If petitioner did not develop

10

the factual basis of a claim in state court proceedings, he may do so in federal court proceedings only where he demonstrates that

> (A) the claim relies on--
>> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

§ 2254(e)(2). "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." Schriro v. Landrigan, 127 S. Ct. 1933, 1940 (2007).

## C. Sufficiency of the Evidence

As he did on direct appeal to the Supreme Court of Virginia, Riner argues in Claim 1 that the evidence of arson was insufficient to support his conviction for that offense.[4] In rejecting this claim on the merits, the Supreme Court of Virginia stated:

> To prove arson, as with any criminal charge, the Commonwealth must establish beyond a reasonable doubt both the corpus delicti and criminal agency. [...] The corpus delicti of arson "must consist of proof that the fire was of incendiary, rather than of accidental origin." [...] Here, Riner challenges the sufficiency of the evidence only with regard to the corpus delicti, i.e., whether the fire was of

---

[4]Riner raised the issues in federal Claims 1 through 5 in his state habeas petition, although he had already raised them on direct appeal. The circuit court dismissed all five claims as procedurally barred from habeas review under the rule in Slayton v. Parrigan, 205 S.E.2d 680 (Va. 1974). Riner argues that this ruling was erroneous, as Slayton only bars habeas review of claims not raised at trial and appeal, and that based on this alleged state court error, federal habeas review of Claims 1 through 5 is not subject to the deference mandated under § 2245(d) and should be de novo. He is mistaken. By its plain terms, § 2254(d) applies to any claim that the state courts adjudicated on the merits. Accordingly, its standard applies to Riner's Claims 1 through 5 to the extent that the state courts addressed these issues on the merits at trial and on direct appeal. Moreover, this court cannot find that the state habeas court misapplied Slayton to bar state habeas review of these claims. See 205 S.E.2d at 682 (holding that "when a prisoner has been afforded a fair and full opportunity to raise and have [an alleged non-jurisdictional defect] adjudicated" at trial and during his appeal, he has no standing to raise that issue in habeas proceedings). See also Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); Burket v. Angelone, 208 F.3d 172, 184 (4th Cir. 2000) (holding that state court's finding of procedural default that rests on determination of state law is not reviewable in federal habeas proceedings).

11

incendiary origin. Notably, Riner does not challenge on appeal the sufficiency of the evidence to support the jury's determination that he was the criminal agent. In other words, Riner implicitly agrees that the Commonwealth presented sufficient evidence to establish beyond a reasonable doubt that, if the fire was of incendiary origin, he was the criminal agent who started the fire.

With regard to the corpus delicti, a defendant has the benefit of a presumption that the fire was caused by accident. [...] That presumption is, however, rebuttable. [...] "Whether the origin of a fire was accidental or incendiary is a question of fact, and resolution of that question may, and often must, turn upon the weight of circumstantial evidence." [...] Such is the present case.

The Commonwealth's evidence regarding the incendiary origin of the fire came primarily from two individuals, Clark D. Davenport and John D. Walker, both of whom testified as experts in the field of investigating the origin and cause of fires. Davenport and Walker each inspected the Riner home after the fire and concluded that the fire was of incendiary origin.

Specifically, Walker opined that the "fire started at the south end of the home" where the living room and master bedroom were located, and that it "was caused by an intentional human act meaning it was an incendiary or an arson fire." In his opinion, the fact that the floor of the front porch and the "uprights" in the porch were completely consumed by the fire was unusual and indicated "a tremendous amount of fire at the whole front end of that home." Because of the extent of burning on the floor of the Riner house and the burn patterns there, Walker further opined that "liquid accelerant" had been poured on the fire and that the liquid "ignited and burned the floor first before everything else fell down on top of the floor." Walker testified that he eliminated any potential accidental cause of the fire and found no indication that the fire started in the electrical panel box because there was no evidence of arcing there. Even though an analysis of debris samples that Walker had collected from the fire scene contained no evidence of liquid accelerant residue, Walker did not alter his conclusions.

Similarly, Davenport opined that "deep seated charring of burn patterns in areas on the floor of the master bedroom" were caused by "burning of an ignitable liquid that had been poured on the floor." During his investigation of the fire, Davenport found evidence of newspaper strips in several areas of the house, including the floor in the master bedroom where Denise's body was found. Davenport opined that the newspapers were "used as an accelerant to spread the fire." He stated that "the newspapers in conjunction with an ignitable liquid were spread throughout the first floor of the dwelling in the areas where [he] determined that a flammable liquid or ignitable liquid patterns were discovered."

Davenport further testified that he found no evidence that would cause him to conclude that the origin of the fire could not be determined or was accidental. He also discounted a theory advanced by one of the defense's expert witnesses that the fire had been caused by a short circuit in a baseboard heater. In Davenport's opinion, the evidence of short-circuiting that he found in the wiring that remained in the house was the result of the fire and not the cause of it. When asked what kind of analysis he performed to eliminate other possible sources of ignition, Davenport responded, "In conjunction with Mr. Riner's statements to me, as far as the condition of the house, smoking habits, electrical problems, coupled with what I observed at the

12

scene, I was able to eliminate the natural or accidental fire causes verses [sic] what I saw; glaring evidence of an ignitable liquid poured and burned."

It is true, as Riner argues, that other expert witnesses who investigated the fire, some of whom testified on behalf of the Commonwealth, opined that the origin of the fire could not be determined. It is also true that Riner introduced evidence showing that the fire had been caused by a short circuit in a baseboard heater. But, as Riner conceded during oral argument, the conflicting evidence created a "credibility battle" among the experts. "'Conflicting expert opinions constitute a question of fact . . . .'" [...] In that situation, it is within the province of the finder of fact, in this case the jury, "'to assess the credibility of the witnesses and the probative value to be given their testimony.'" [...]

Viewing the evidence in the light most favorable to the Commonwealth, as we must since it was the prevailing party in the trial court, [...] we conclude that there was sufficient evidence from which the jury reasonably could have inferred that the fire was incendiary in origin. "When a fact-finder has accepted the testimony of a qualified expert witness, which negates every reasonable possibility that a fire was of accidental origin, we cannot hold the evidence insufficient, as a matter of law, to support a finding that the fire was of incendiary origin." [...] Accordingly, we hold that the trial court did not err in finding the evidence of arson sufficient to support the jury verdict.

Riner, 601 S.E.2d at 573-74 (citations omitted).

Although Riner challenged the sufficiency of the evidence under state law, any challenge to sufficiency also presents a federal due process claim. In re Winship, 397 U.S. 358, 364 (1970); Pope v. Netherland, 113 F.3d 1364, 1368 (4th Cir. 1997). To prevail on a federal habeas claim of evidentiary insufficiency, petitioner must prove that, viewing the record evidence in the light most favorable to the prosecution, no rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Id. at 319. The Jackson standard does not require the habeas court to ensure that the prosecution's case ruled out "every hypothesis except that of guilt."[5] Id. at 326. "[F]aced with a record of historical facts that

---

[5]Under Virginia law, "[i]t is not sufficient that facts and circumstances proved be consistent with the guilt of the accused. To sustain a conviction they must be inconsistent with every reasonable hypothesis of his innocence." Stawderman v. Commonwealth, 108 S.E.2d 376, 380 (Va. 1959). A federal habeas court, however, need not apply this stricter state standard of review for sufficiency of the evidence, since matters of state law do not rise to the level of a constitutional claim. Inge v. Procunier, 758 F.2d 1010, 1015 (4th Cir. 1985).

13

supports conflicting inferences [the <u>habeas</u> court] must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." <u>Id.</u> The court may disregard a witness's testimony only upon finding that it required the jury to find facts that defy physical laws or common sense, such that the testimony is incredible as a matter of law. <u>See, e.g.</u>, <u>Schrader v. Whitley</u>, 904 F.2d 282, 287 (5th Cir. 1990); <u>Tapia v. Tansy</u>, 926 F.2d 1554, 1562 (10th Cir. 1991) ("[T]o be considered incredible, [the testimony] must be unbelievable on its face, i.e., testimony as to facts that [the witness] physically could not have possibly observed or events that could not have occurred under the laws of nature.") (internal quotations omitted). The <u>habeas</u> court may not make its own subjective determination of guilt or innocence. <u>Jackson</u>, 443 U.S. at 318-20.

Riner asserts that the evidence was insufficient to support the jury's finding that the fire was intentionally set. The Supreme Court of Virginia upheld the sufficiency of the evidence of arson in Riner's case, finding that the jury reasonably could have found, from the testimony of two fire scene experts, Walker and Davenport, and the physical evidence on which they relied, that the fire was set and that all hypotheses of innocence were eliminated. Riner challenges this finding on the grounds that the testimony of these two experts was "inherently incredible" and "internally contradictory," "did not comport with known physical facts," was discredited by the testimony of other fire experts, required a "belief that Riner accomplished impossible feats," and failed to "exclude accidental causes."

Although Davenport and Walker disagreed as to the number of points of origin, their theories were otherwise quite similar. (Trial Transcript, Vol. VIII at pages 10-147) (hereinafter "Tr. VIII:10-147; IX:44-150"). Their findings regarding cause and origin were based on reports of the fire from firefighters and other eye witnesses and the burn patterns in the remains of the house. They both testified that burn patterns indicated that an ignitable liquid (not gasoline) had been poured on the floor in several rooms and that a "solid accelerant" (such as the newspaper strips) may also have accelerated the fire's burning. They both testified that although they did not need to eliminate

accidental causes in all cases, they had done so in this case. Riner argues that to give credence to the theories of these two experts, a juror would have had to believe that Riner obtained at least a gallon of an unidentified ignitable liquid other than gasoline, combined it in several rooms with torn newspaper strips without getting any of the liquid on himself or leaving a container to be discovered, and then lit the fire so that it would burn in such a way as to obliterate all traces of the liquid accelerant itself while allowing Riner a chance to save the children and himself by going out through the upstairs window. The court cannot agree that this scenario is so obviously physically impossible on its face that no reasonable juror could have relied on the testimony from Walker, Davenport, or both to find that the fire was set.

Jurors heard a lengthy defense case against a finding of arson. They heard Riner's own testimony denying that he started the fire and asserting that he barely escaped it himself, along with his children. (Tr. XVI:98-99). Jurors also heard testimony from expert witnesses for the defense, John DeHaan and Richard Roby (Tr. XIV:28-202; XX:54-295), directly contradicting every aspect of the observations that Walker and Davenport made to support their findings that the fire was set. They and numerous other witnesses who had examined the fire scene, including one of the Commonwealth's witnesses, testified that the cause and origin of the fire could not be determined from the remains of the house. DeHaan and Roby testified that in building their expertise, they had started, observed, and cataloged the nature of the debris of hundreds of structure fires started by various methods. DeHaan testified that the burn patterns on the floors were not consistent with the use of accelerant, that the porch likely burned up because of its design and ventilation, that isolated areas of deep charring or burn through of the flooring could have been caused by "drop down" (burning material from a wall or from the upper floor falling onto the first floor), that many items normally found in a modern home serve as "accelerants" and can cause "flashover" (buildup of heated gases causing everything in a room to catch fire simultaneously), and that in his opinion, the Riner fire evidence was most consistent with an accidental fire occurring in the master bedroom. DeHaan opined that Walker's determination of six to eight points of origin and Davenport's

15

determination of four points of origin were inconsistent with the evidence and that the burn patterns on the floor (on which Walker and DeHaan primarily relied as evidence of an accelerant-set fire) were more consistent with flashover and drop down burning.

Roby also discredited the scientific reasoning of Walker and Davenport and found their theories to be inconsistent with the evidence and with each other. Roby testified that in his investigation, he examined the breaker box in the basement and found two breakers had been "tripped." Wiring from one of the tripped breakers traced back to a baseboard heater in the master bedroom. Roby also found evidence of "arcing on the wiring" for these circuits, consistent with an electrical fault or "short circuit." According to Roby, the fact that the power lines to the house were down by the time the fire department arrived made it more likely that the arcing in the wiring occurred earlier in the fire event, while the wires were still energized, as shorts could not have occurred without power.[6] Neither Walker nor Davenport traced the wiring from the tripped breakers. Roby also pointed out several problems with the Walker and Davenport theories of how the fire developed: accounts of eye witnesses as to where they saw flames when the fire was first discovered discredited the theory that the dining room was a point of origin; use of accelerant in several rooms would likely have caused an explosion; intense burning, deep charring, holes in the bedroom floor, and melting of metal alloy in door or window frames could have been caused by flashover or drop down burning, encouraged by ventilation from the crawl space beneath the room; burn patterns caused by accelerant and those caused by flashover can be confused with each other, contrary to Davenport's opinion; and heavy charring around the victim's body could have been caused by melting body fat, while accelerant used in that area would have "wicked" into her clothing and remained detectable in unburned portions. Roby opined that at least two possible accidental causes for the fire could not be eliminated: a smoldering fire in the bedroom producing sufficient carbon monoxide to kill the victim before it grew into a substantial enough fire to generate flashover; or a

---

[6]Roby testified on cross examination that although the baseboard heaters were not in use at the time of the August 1998 fire, the wires would nevertheless have been energized and could have short circuited.

16

smoldering or flaming fire in the livingroom that produced carbon monoxide sufficient to kill the victim before burning through to the bedroom. He did not find the evidence to be consistent with a flaming fire originating in the bedroom, opining that the victim would have been burned by such a fire before it could have generated sufficient carbon monoxide to kill her. He found no evidence to support a finding that the Riner fire was intentionally set, but as a result of the extensive destruction, found the actual cause to be undetermined.

Riner argues that his experts' testimony proved the theories of Walker and Davenport to be inherently incredible. The court cannot agree. While the testimony highlighted the fact that physical evidence at the fire scene supported highly conflicting inferences, the court cannot find that the defense case rendered the Walker and Davenport theories incredible as a matter of law or that the state courts' findings of evidentiary sufficiency were unreasonable. None of the experts found outright that the fire was accidental; except for Walker and Davenport, they found that the cause was undetermined. Although DeHaan believed that the evidence excluded accelerants as the cause of the fire and that the floor damage was caused by flashover and drop down, he admitted that flashover might occur as a stage of an accelerant set fire and "overwhelm the somewhat subtle traces left by many kinds of accelerant," (Tr. XIV: 61,144-45). Roby testified that the arcing in the wiring from the master bedroom heater could have been caused by the fire rather than by a short circuit. (Tr. XX:76-77). Several of the defendant's expert witnesses testified that reasonable experts examining the evidence could disagree over what caused the fire. (XV:157 (Hine); XX:168 (Roby)).

In short, all of the alleged weaknesses Riner identifies in the Commonwealth's case implicate weight of evidence and credibility issues. Once again, Jackson does not allow a federal habeas court to second guess triers of fact in determining witness credibility, weighing the evidence, resolving conflicting testimony, and eliminating hypotheses of innocence. These functions belong to the jury. The testimony of Walker and Davenport could not have been stricken as incredible as a matter of law, and it was (and remains) the province of the jurors to resolve contradictions in their testimony. The jurors could reasonably have believed from the testimony of Walker and/or Davenport that the

17

fire scene evidence indicated an incendiary fire, caused by use of some form of ignitable liquid and newspaper strips, and the evidence contradicting this scenario came from other experts, interpreting the same fire scene evidence, who could not determine an accidental cause for the fire. See, e.g., Schrader v. Whitley, 904 F.2d 282, 286 (5th Cir. 1990) (finding sufficient evidence of arson where "at best the rival hypothesis was that the fire's origin could not be determined"). Once the jurors determined that Walker or Davenport or both were credible and found their opinions to outweigh those of the other experts, the jurors had sufficient evidence from which to infer, reasonably, that the fire was arson, as illustrated in the state courts' opinions.[7] Whether or not this court would reach the same finding from the trial evidence as the jury did is not a permissible inquiry under Jackson or under § 2254(d).[8] Riner has not established that no reasonable juror could find arson beyond a reasonable doubt, and his claim fails accordingly under Jackson. 443 U.S. at 319. Because this court cannot find that the state court's disposition of this claim was contrary to, or an unreasonable application of, Jackson as established federal law or based on an unreasonable determination of facts, the court must grant the motion to dismiss as to this claim.

### D. PRIVATE PROSECUTOR

Riner argued on appeal that Guy M. Harbert III, Esq., the private prosecutor hired by the victim's family to assist the Commonwealth's Attorney, had conflicts of interest and controlled the prosecution's case to such an extent that Riner's state and federal due process rights were violated.

---

[7]The Supreme Court of Virginia reasonably found no need to analyze on appeal whether the evidence was sufficient to support the other elements of the offenses on which Riner was convicted, because Riner's appeal claim challenged only the sufficiency of the "corpus delicti" portion of the prosecution's proof. Riner cites Estelle v. McGuire for the proposition that "the prosecution's burden to prove every element of the crime is not relieved by a defendant's tactical decision not to contest an essential element of the offense." 502 U.S. at 69. This statement, however, refers to the prosecution's burden of proof at trial; it does not impose an additional burden on appellate courts to address issues not presented in the appellant's petition for appeal.

[8]Riner seeks to bring new evidence to prove that the jury's finding was wrong: (1) a 2002 article about baseboard heaters known to short circuit and cause fires and (2) a television show about how arson experts erroneously rely on burn patterns as evidence of arson. As this evidence was not presented to the trial court, it is not part of the record on which this court must decide Riner's sufficiency of the evidence claim. Jackson, 443 U.S. at 318. The court will, however, consider this evidence in conjunction with Riner's actual innocence argument.

18

Riner, 601 S.E.2d at 568. Virginia courts have held that while use of private prosecutors is permitted, the procedure may violate Article I, § 11 of the Constitution of Virginia if the private prosecutor has a personal interest in the outcome of the case or if the public prosecutor relinquishes control of the case to the private prosecutor. Cantrell v. Commonwealth, 329 S.E.2d 22, 26-27 (Va. 1985). Riner offered evidence that CIGNA, the parent company of the insurance company through which Denise Riner's employer insured her life, had been or was in some capacity represented by Harbert's law firm in matters unrelated to Riner's case and argued that this representation created an impermissible conflict of interest. Riner, 601 S.E.2d at 568. He also argued that Harbert's level of participation in presenting the prosecution's case exceeded that deemed lawful under Cantrell. The state courts accepted Harbert's representation that he had found no conflicts of interest involving the insurance company that would prohibit him under state law from serving as special prosecutor. Id. Furthermore, the state courts made a factual finding that the public prosecutor "remained in continuous control of the case." Id. at 569 (citations omitted). Based on these findings, the state courts found no violation of Riner's due process rights under the state constitution. Id.

The respondent argues that as a federal due process claim, this issue is unexhausted and procedurally barred because Riner did not present it as a federal constitutional claim to the state courts.[9] The record refutes this procedural default argument. Riner's appeal briefs in the Court of Appeals of Virginia and in the Supreme Court of Virginia both present this claim not only as a violation of state law, but also as a violation of the defendant's rights under the Fourteenth Amendment to the United States Constitution.[10] Therefore, the court finds that a federal due process claim was exhausted under § 2254(b). See Duncan v. Henry, 513 U.S. 364, 365-66 (1995) (finding

---

[9]In his federal petition, Riner merely asserts that use of the private prosecutor was "unlawful," without identifying any specific right violated or citing any case law. In an abundance of caution, however, the court construes his claim as asserting a violation of the Due Process Clause under the Fourteenth Amendment. To the extent that Riner also presents this claim as a violation of state law, he has no ground for federal habeas relief. See Estelle, 502 U.S. at 67-68.

[10]Riner argued on appeal to the Supreme Court of Virginia: "Harbert's conflict of interests was sufficient to violate [Riner's] due process rights. . . . [U]nder Ganger [ v. Peyton, 379 F.2d 709 (4th Cir. 1967)], it violated the Fourteenth Amendment to the United States Constitution." ( Pet. App, 30).

19

that to satisfy exhaustion requirement, <u>habeas</u> petitioner must "apprise the state court of his claim that the evidentiary ruling of which he complained was not only a violation of state law, but denied him the due process of law guaranteed by the Fourteenth Amendment"). As the state courts did not adjudicate this aspect of Riner's claim, § 2254(d) does not apply to this court's analysis of this claim. <u>Weeks v. Angelone</u>, 176 F.3d 249, 263 (4th Cir. 1999). The state courts' factual findings, however, are entitled to a presumption of correctness, pursuant to § 2254(e)(1), absent petitioner's rebuttal by clear and convincing evidence.

In support of his federal due process claim, Riner relies on <u>Young v. United States ex rel. Vuitton et Fils, S.A.</u>, 481 U.S. 787, 802 (1987) (<u>citing</u> <u>Berger v. United States</u>, 295 U.S. 78, 88 (1935) (recognizing that the prosecutor has an obligation to seek "the twofold aim . . . that guilt shall not escape nor innocence suffer."), <u>overruled</u> <u>on</u> <u>other</u> <u>grounds</u>, <u>Stirone v. United States</u>, 361 U.S. 212 (1960). In the <u>Young</u> decision, the United States Supreme Court held that federal judges could not properly appoint a private lawyer representing the beneficiary of a court order, simultaneously, to prosecute a criminal contempt action alleging a violation of the order, because such an appointment "at a minimum create[s] opportunities for conflicts to arise and create[s] at least the appearance of impropriety." 481 U.S. at 806. Riner's case is not controlled by <u>Young</u>, however; he was not prosecuted in federal court for contempt and the private prosecutor did not take the place of the state prosecutor in making any key prosecutorial decisions. Therefore, the <u>Young</u> decision does not support any ground for federal <u>habeas</u> relief in Riner's case.

Moreover, Riner fails to demonstrate that Harbert's participation in his case violated his federal due process right to prosecutorial impartiality. <u>See</u> <u>Berger</u>, 295 U.S. at 88 (finding that government's interest "in a criminal prosecution is not that it shall win a case, but that justice shall be done"; <u>Smith v. Phillips</u>, 455 U.S. 209, 219 (1982) ("the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor"). The Fourth Circuit has held that the state court practice of allowing a private prosecutor to assist the public prosecutor in various ways during the trial process does not violate

the defendant's due process rights so long as the public prosecutor remains able to "make an unbiased use of all the options available to the prosecutor's office." Jones v. Richards, 776 F.2d 1244, 1247 (4th Cir. 1985) (citing Ganger, 379 F.2d at 714-15). The public prosecutor must retain his ability "for the fair minded exercise of [his] discretion, including his options of whether to seek indictment, upon what charge, whether to plea bargain, and the possibility of a nol pros." Id.

In Jones, passengers injured in a motor vehicle accident caused by Defendant Jones employed attorneys to represent them in a civil action against Jones and also to assist the prosecution in the criminal proceeding against Jones; in the civil action, the attorneys worked on a contingency basis, but for their work assisting the state prosecutor, they were "paid on a time basis." Id. at 1245. On appeal, the Fourth Circuit found no Fourteenth Amendment violation, because the district attorney retained control of the prosecution in the state Superior Court and because there was no evidence that the private attorneys tried to use their position in the criminal action to force a higher civil settlement. Id. at 1246. The Fourth Circuit distinguished the Jones case from Ganger, a case in which the Commonwealth's Attorney was prosecuting the defendant on criminal charges, while representing the defendant's wife in a divorce case, and tried to use his public position "to coerce [the defendant] into settling the divorce action." Id. (citing Ganger, 379 F.2d at 714-15).

Pursuant to § 2254(e)(1), this court will presume correct the state court's finding that the Commonwealth's Attorney remained in continuous control of the criminal case against Riner. Riner, 601 S.E.2d at 569. Furthermore, the court concludes that this finding is fully supported by the record and is dispositive of the federal due process issue. Riner presents no evidence that Harbert played any role whatsoever in the critical prosecutorial actions in Riner's case, including the indictment process, plea discussions, and the decision about what penalties to seek. It is undisputed that the Commonwealth's Attorney continuously retained all of these functions. Moreover, Riner presents no evidence that Harbert's participation in presenting evidence, examining witnesses, and making argument to the jury interfered with the Commonwealth's Attorney's independence in making the critical prosecutorial decisions in Riner's case. Indeed, the facts of Riner's case are far less

21

indicative of potentially prejudicial conflicts on the part of the private prosecutor than were the facts of the <u>Jones</u> case, in which the Fourth Circuit found no due process violation. 776 F.2d at 1245-46. Cheryl Ringley, one of the victim's sisters, and her husband, Greg Ringley, paid Harbert a set fee for his assistance to the prosecutor. The Ringleys and others of Denise's family were involved in litigation after the fire, seeking visitation with and then custody of the Riner children, challenging Riner's insurance claims, and suing him for monetary damages in relation to Denise's death. The record does not indicate, however, that Harbert served as the legal representative of any of Denise's family members in any of these other legal matters. The record also does not indicate any likelihood that Harbert would receive greater compensation if Riner was convicted than if he was acquitted. Thus, the court finds no evidence of conflicts in interest of the type that the Fourth Circuit found objectionable in the <u>Ganger</u> case. The court will, therefore, deny relief on the federal due process claim.

Riner moves the court to expand the record to include the exhibits that he submits with his response to the motion to dismiss. The court will allow all of the exhibits to become part of the record in this case. Related to the conflict of interest issue, Riner submits several copies of documents purporting to be from lawsuits in which Harbert's law firm represented companies related to Riner's criminal proceedings.[11] However, Riner also seeks leave to engage in discovery to develop further evidence of conflicts, to obtain a copy of the agreement Harbert signed when he was retained by the Ringleys,[12] to interview Harbert, and to have an evidentiary hearing. (Pet. Resp., 64; Dkt. 35:5-6). Riner offers no reason that this conflicts evidence could not have been discovered,

---

[11]Specifically, Riner's exhibits indicate that shortly before or during Riner's trial, other attorneys at Harbert's law firm represented a "CIGNA [company]"; Traveler's Insurance (against whom Riner was pursuing a home insurance claim); and Medshares Home Health (Denise's employer) in several workers compensation cases. (Pet. Resp., Ex. 9-24).

[12]Riner complains that Harbert never provided the court with a copy of the retention agreement he signed when the Ringleys hired him as private prosecutor "in order to ensure Riner's conviction." (Pet. Resp., 53). Even if this agreement included language indicating that Harbert would work hard to see that Riner was convicted, neither this language alone nor the fact of his $50,000 fee would prove that Riner's trial was unfair because of Harbert's participation.

22

with due diligence, at the time of trial or during state court <u>habeas</u> proceedings. Therefore, Riner is barred under § 2254(e)(2)(ii) from having this evidence considered in this federal <u>habeas</u> proceeding, <u>Gray</u>, 518 U.S. at 162, and further discovery of related materials is not warranted. <u>See</u> Rule 6, Rules Governing § 2254 Cases.

In any event, Riner fails to demonstrate how the fairness of his trial was adversely affected by the fact that Harbert's law firm represented the victim's former employer and the insurance companies who insured his home and his wife's life. Harbert himself did not personally litigate any of the newly identified cases, and none of the cases has any relationship to Riner's cases, civil or criminal. Indeed, Riner offers no evidence that Harbert was aware of, or had any personal interest in, any of the cases Riner submits here. Therefore, Riner fails to show that the new evidence proves any federal due process violation related to Harbert's participation in his trial. <u>See</u> <u>Smith</u>, 455 U.S. at 219.

In his response to the motion to dismiss, Riner raises a new claim, alleging that the trial court violated his right to present a defense by prohibiting counsel from disclosing to the jury that the Ringleys were paying Harbert $50,000 to serve as special prosecutor in the case. (Pet. Resp., 54). Riner wanted to use this information to impeach the Ringleys' testimony that they were not "wealthy." Riner also asserts that this ruling shows bias by the trial judge in protecting his personal friends, Harold and Alma Jean Ringley, who are Greg Ringley's brother and his wife. (Pet. Resp., 54). To the extent that Riner seeks to amend his petition to raise these new claims, the amendment is late under § 2244(d)(1)(A). These claims depend on a different core of facts and a different set of legal arguments than the due process claim presented in his original petition related to the private prosecutor's participation. Therefore, the new claims do not relate back to any timely filed claim under Rule 15(c)(1)(B), and the court will dismiss them as untimely.

### E. JUROR MISCONDUCT

The trouble with juror Gibson began on the morning of the eighth day of Riner's trial. <u>Riner</u>, 601 S.E.2d at 563-65. Before the trial proceedings resumed that day, Gibson showed up at the

23

Commonwealth's Attorney to ask a question about one of the Commonwealth's exhibits. Gibson had noticed an error on the exhibit, indicating that Riner had found his wife's body, although other evidence indicated that Riner was at the hospital when he learned of his wife's death. The prosecutor did not speak to Gibson and reported the incident to the court. The court denied Riner's motion for mistrial on this ground, finding no prejudice.

On the eleventh day of trial, a court officer delivered to the court a note from a juror, directed to the Commonwealth's Attorney. The note asked what type of clothing was left, unburnt, beneath the victim's body. When the parties learned of the note, Riner did not move for mistrial. Riner himself testified on the sixteenth day of trial. During his testimony, counsel moved for mistrial because of juror Gibson's "distractions, inattentiveness, and . . . misconduct." Counsel argued that Gibson had been talking to two fellow jurors while evidence was being presented. The court and the prosecutor had also noticed such behavior.

In response to the defense motion for mistrial, the trial court questioned under oath Gibson and the two jurors to whom he had spoken. Gibson admitted that while a witness was testifying, he commented to other jurors about two exhibits. One exhibit was a picture of Denise's pearl ring, and Gibson observed to another juror that "it looks like that pearl ring that [Denise] got and [Riner] said he didn't recognize any of the rings." Id. at 564. The two other jurors questioned confirmed that juror Gibson had commented to them about certain exhibits, but each juror stated that she "had not been influenced by juror Gibson's comments and still had an open mind about the case." Id. Riner moved for mistrial at this point, based on "the kind of unknown comments [Gibson]'s made in the jury room." In the alternative, the defense asked the court to dismiss Gibson from the jury. The court denied the mistrial motion, but dismissed Gibson from the jury.

The court told the remaining 14 jurors about Gibson's dismissal and asked them as a group if Gibson had talked to any of them about the evidence, exhibits, or facts of the case. Eight jurors raised their hands. The court questioned each of these jurors individually.

> That questioning revealed that juror Gibson had indeed made comments about the
> evidence. For example, he had speculated that, if Denise was not clothed, she might

24

have been raped, and he had discussed a witness's testimony about the terms "flammable" and "combustible." Juror Gibson also had made inappropriate sexual comments to a juror. All the jurors who were questioned expressed their annoyance with juror Gibson and his behavior. They told the trial court that they had repeatedly asked him to refrain from discussing the evidence, and some admitted that they had attempted to avoid him. They were also adamant that they had not been influenced by juror Gibson's behavior and comments, still had open minds about the case, and could be fair to both sides. In one juror's words, "[Y]ou could tell he was kind of a blow bag."

Several jurors also reported that juror Gibson had frequently contacted his wife during the lunch break in order to learn what the newspaper headlines said about the trial. He had then attempted to share that information with the jury. However, only one juror remembered anything specific that he had said about the newspaper reports. That juror recalled that juror Gibson had mentioned that a newspaper article reported that the defense had moved for a mistrial because jurors were taking notes.

Id. at 564-65. Riner moved for mistrial, based on Gibson's comments to jurors and the newspaper report. The court denied the motion, but cautioned the remaining jurors to "disregard" any of Gibson's comments and instructed them to "rely on [their] independent recollection of the facts," exhibits, and the law as presented to them in the courtroom. Id. at 565.

On appeal, Riner asserted that Juror Gibson's misconduct deprived him of a fair trial in violation of his due process rights. In rejecting this claim, the Supreme Court of Virginia stated the following:

Riner asserts that juror Gibson's contact with his wife regarding the newspaper headlines about the case was unauthorized third party contact. Citing Remmer v. United States, 347 U.S. 227, 229 (1954), Riner argues that such contact was presumptively prejudicial, thereby shifting the burden to the Commonwealth to establish that it was harmless to the defendant. We agree that the legal standard for evaluating a claim of extraneous jury contact requires that "'any private communication, contact or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury . . . [be] deemed presumptively prejudicial'" unless the contact was pursuant to the directions and instructions of the trial court with complete knowledge by both parties. Lenz v. Warden, [ . . . ] 593 S.E.2d 292, 298 ([Va.] 2004) (quoting Remmer, 347 U.S. at 229).

This presumption, however, is not conclusive. Id. The prosecution has the burden "to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant." Id. We explained in Lenz that "[t]he Remmer presumption of prejudice arises upon a showing of two elements: that an extraneous contact with or by a member of the jury took place and that such contact was 'about the matter pending before the jury.'" [ . . . ] 593 S.E.2d at 298 (quoting Remmer, 347 U.S. at 229).

25

Clearly, juror Gibson's communication with his wife about the headlines in the newspaper was an improper contact with a third party about the matter pending before the jury. However, it is debatable whether his communication, or attempted communication, of the content of the newspaper headlines to the other jurors constituted extraneous jury contact. Instead, it is analogous to jurors' reading or hearing news media reports about the criminal trial in which they are sitting.

In <u>Thompson v. Commonwealth</u>, [ . . . ] 247 S.E.2d 707, 709 ([Va.] 1978), we addressed an incident in which two jurors in a criminal trial admitted that they had read a newspaper article concerning the evidence and the defendant. We enumerated the following principles for resolving whether that kind of jury conduct denied a defendant of a fair trial:

> First, the influence of newspaper articles or other publicity during a criminal trial may be of such a nature as to deprive a defendant of a fair trial. Second, jurors serving in a criminal case may not, during the trial, properly read newspaper stories or listen to media reports discussing the proceedings. The basis for this elementary proposition is that a juror's information about the case should come only from the evidence presented at trial and not from any extraneous source. Third, upon a showing that such jurors have read or heard news accounts of the proceedings, the test to be used by the trial court in determining if a mistrial or a new trial should be ordered is whether under the circumstances there has been interference with a fair trial. Fourth, mere reading or hearing news accounts of the trial while it is in progress does not in every case amount to prejudicial misconduct by the jury as a matter of law. Some publicity to which jurors have been exposed may be inherently prejudicial while in other cases inquiry will be necessary to ascertain whether the information "may have effectively prejudiced the jury in its deliberation." Fifth, the decision whether such media information brought to the jury's attention results in prejudice to the defendant rests in the sound discretion of the trial court. And, sixth, because there can be no fixed rule which defines what constitutes prejudicial interference with a fair trial, each case must be decided on its special facts.

<u>Id.</u> [ . . . ] at 708 (internal citations omitted).

Our holding in <u>Thompson</u> requires a trial court to determine whether a juror's exposure to media coverage of the proceedings interfered with a fair trial. Unlike extraneous juror contact, a juror's reading or hearing news accounts about a criminal trial is not presumptively prejudicial. For purposes of this case, we will, however, apply the test set out in <u>Remmer</u> and <u>Lenz</u> and assume, as did the Court of Appeals, that juror Gibson's contact with his wife about the newspaper article reporting that the defense had moved for a mistrial because the jurors were taking notes, as well as his communication, or attempted communication, of that information to other jurors, was "sufficient to shift the burden to the Commonwealth" to prove the contact was harmless to Riner. <u>Riner</u>, [ . . . ] 579 S.E.2d at 685.

We conclude that the Commonwealth carried its burden. First, juror Gibson was discharged from jury service; so he did not participate in the deliberations that resulted in the guilty verdict. [ . . . ] That is a significant fact distinguishing the present case from many other cases involving juror misconduct. [ . . . ]

26

Second, only one juror heard or remembered juror Gibson's comment about the specific newspaper article discussing a defense motion for a mistrial. Next, the questioning of the jurors revealed that they were not influenced by juror Gibson, actually attempted to avoid him so they would not hear his comments, and still had open minds about the case. Finally, after releasing juror Gibson, the trial court not only instructed the jurors to disregard anything that juror Gibson had said but also told them that some of his comments were not correct. Unless the record shows otherwise, and it does not in this case, we presume that a jury follows an explicit cautionary instruction given by the trial court. [ . . . . ] In summary, the extraneous juror contact was harmless to Riner. Thus the trial court did not err in denying Riner's motion for a mistrial based on "unauthorized third party contact."

## 2. OTHER MISCONDUCT

Before determining whether juror Gibson's "other misconduct" warranted a mistrial, we reiterate several applicable principles. "[T]he mere fact of juror misconduct does not automatically entitle either litigant to a mistrial." Robertson v. Metropolitan Washington Airport Auth., . . . 452 S.E.2d 845, 847 (Va. 1995) [ . . .]. As the party moving for a mistrial, Riner had the burden to establish that juror misconduct "probably resulted in prejudice." Robertson, . . . 452 S.E.2d at 847. The trial court, in the exercise of its discretion, makes that determination. Id. Here, the trial court properly investigated the misconduct when it was brought to its attention. See id. (trial court abuses its discretion by ruling on motion for mistrial without investigating the alleged misconduct when it is discovered after the jury is discharged). Finally, we have generally limited findings of prejudicial juror misconduct to events that occurred outside the jury room and that interjected information about the case that was not admitted into evidence. [ . . . . ]

Applying these principles, we conclude that the trial court did not abuse its discretion in denying Riner's motions for a mistrial based on the "other misconduct" by juror Gibson. First, as the Court of Appeals noted, there is no evidence that any juror was aware of juror Gibson's brief contact with the office of the Commonwealth's Attorney or his efforts to resolve an apparent conflict in the evidence. Riner, [ . . . ] 579 S.E.2d at 684. Thus, Riner has not shown how he was prejudiced by that incident since juror Gibson did not participate in the jury deliberations.

Next, after learning about the anonymous note directed to the Commonwealth's Attorney, Riner did not move for a mistrial. Thus, he cannot now be heard to complain about that incident. Rule 5:25.

Continuing, when Riner moved for a mistrial after juror Gibson was released from jury service, Riner was not concerned about the two jurors to whom juror Gibson had been making comments while in the jury box. Instead, Riner based his motion on unknown comments that juror Gibson might have been making in the jury room. At that point, the nature of those comments was not known and the trial court had discharged juror Gibson. Thus, Riner failed to demonstrate how he was prejudiced.

Finally, when Riner renewed his motion for a mistrial after the eight additional jurors had been questioned, he offered only three reasons in support of the motion: (1) juror Gibson's comment about the exhibit showing the pearl ring; (2) juror Gibson's speculation that Denise might have been raped; and (3) the newspaper article about the defense mistrial motion. We have already dealt with the third reason. As to the

27

first reason, Riner voiced no concern about the juror who heard the comment about the pearl ring when he moved for a mistrial after juror Gibson had been questioned. Nevertheless, upon considering the nature of that comment as well as juror Gibson's speculation that Denise might have been raped, we conclude that Riner did not establish that juror Gibson's misconduct probably resulted in prejudice to Riner. [ . . . . ] As we previously explained, the trial court discharged juror Gibson before the jurors began their deliberations; the jurors were not influenced by juror Gibson but found him annoying; they remained able to listen to the evidence with open minds; and the trial court carefully instructed the jurors to disregard anything juror Gibson had said to them about the case.

Riner, 601 S.E.2d at 565-568 (some citations omitted).

As shown, on appeal, Riner divided his juror misconduct claims into two types: (1) third party contact, subject to the federal constitutional standard set forth in Remmer, in which the existence of outside contact triggers a presumption of prejudice and shifts the burden of persuasion to the state to rebut the presumption, 347 U.S. at 229; and (2) other misconduct, subject to a state law standard requiring the petitioner to prove both the misconduct and the probability of prejudice. Liberally construing Riner's somewhat scattered habeas arguments in his current petition, the court will consider Riner's submissions as raising federal due process claims regarding both of these types of juror misconduct.

First, Riner challenges the state courts' application of the Remmer standard to his claim concerning Gibson's contacts with his non-juror wife.

In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial . . . . The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.

Remmer, 347 U.S. at 229. "The trial court . . . should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate." Id. at 229-30. In a case where juror misconduct did not involve outside contacts, courts have wider discretion and need not presume prejudice or conduct a hearing. United States v. Olano, 507 U.S. 725, 739 (1993). In either type of misconduct case, the ultimate inquiry

28

for the reviewing court is whether "the intrusion affect[ed] the jury's deliberations and thereby its verdict." Id.

Riner argues that after Juror Gibson's dismissal, the trial court erred in relying solely on representations by the remaining jurors that they could remain impartial despite Gibson's improper contact with his wife concerning media coverage of the trial. The record refutes this characterization of the court's decision. In denying relief on the third-party contact claim, the state courts also relied on other factors: (a) the trial court dismissed Gibson before deliberations; (b) only one juror remembered Gibson's comment about one newspaper article; (c) questioning of the remaining jurors "revealed that they were not influenced by juror Gibson, actually attempted to avoid him so they would not hear his comments, and still had open minds about the case"; and (d) the trial court issued a cautionary instruction. Riner, 601 S.E.2d at 566-67. This court agrees that these factors, taken together, are sufficient to rebut the presumption of prejudice triggered by Gibson's contact with his non-juror wife. As Riner thus fails to prove that the state courts' disposition of this claim was contrary to or an unreasonable application of established federal law governing this issue or that its application was based on an unreasonable determination of facts, under § 2254(d), this court must grant the motion to dismiss as to the third party contact claim.

Second, Riner claims that the trial court should have declared a mistrial based on other misconduct by juror Gibson not involving outside influences (sometimes termed "intra-jury" misconduct). He proves no ground for relief regarding any of these instances of alleged misconduct.

The portion of the claim concerning the juror note is procedurally barred from federal habeas review. The Supreme Court of Virginia dismissed this claim as defaulted under "Rule 5:25" because Riner did not move for a mistrial on this ground. Riner, 601 S.E.2d at 567. The Supreme Court also remarked that while Riner claimed that Gibson wrote the note, he presented no evidence in support of this assertion. In his federal habeas submissions, Riner claims that Gibson handed the note to the court officer and points to the fact that Gibson had voiced to other jurors his personal speculations about whether Denise had been raped. Riner argues that this evidence somehow proves that Gibson

29

authored the note. Because Riner fails to demonstrate that the state procedural default ground is not adequate or independent, however, the court is procedurally barred from consideration of this claim. See Weeks, 176 F.3d at 270 (finding that Va. Sup. Ct. Rule 5:25 constitutes adequate and independent state law ground for dismissal so as to bar federal habeas review).

The Supreme Court of Virginia addressed on the merits three other incidents of intra-jury misconduct not related to Gibson's wife: (a) his contact with the Commonwealth's Attorney's office, (b) his comments to other jurors about an exhibit showing a pearl ring, and (c) his comment to other jurors that Denise might have been raped. Riner, 601 S.E.2d at 567. Applying a state law standard, the court dismissed Riner's claims as to each of these incidents because Riner failed to show a probability of resulting prejudice. Id. Riner argues that the possibility of jurors being prejudiced against Riner's case by Gibson's intra-jury actions, known and unknown, was sufficient grounds on which to declare a mistrial. A mere possibility of prejudice does not satisfy the ultimate test under Olano: whether "the intrusion affect[ed] the jury's deliberations and thereby its verdict." 507 U.S. at 739. See also Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (finding that federal habeas court cannot grant relief on any ground asserting trial error unless court is convinced that "the error had substantial and injurious effect or influence in determining the jury's verdict"). From the trial court's questioning of other jurors regarding juror Gibson's actions and influence, it is clear that the jurors ignored Gibson while he was in their midst and did not give credence to his comments. This court finds no indication that Gibson's misconduct, known and unknown, had a "substantial and injurious effect" on the verdict. Therefore, the court cannot find that the state courts' disposition of these claims was contrary to, or an unreasonable application of, federal law or that it was based on an reasonable determination of facts, and will grant the motion to dismiss pursuant to § 2254(d).

In his response to the motion to dismiss, Riner moves for leave to develop additional evidence and raise new claims about juror misconduct. This motion must be denied. First, Riner states that in some unidentified manner at some unidentified time, information was conveyed to his family that two jurors from his trial would be willing to testify about misconduct that occurred

30

during deliberations. (Pet. Resp., 82). Even if Riner could demonstrate that he filed this claim was timely filed under § 2244(d)(1)(D), he has no claim here. It is well established that the Sixth Amendment right to a fair trial before an impartial and competent jury does not include the right to use post-conviction testimony or affidavits from jurors to invalidate the verdict, absent some evidence of improper outside influences on the deliberations or some mistake in recording the verdict. See Tanner v. United States, 483 U.S. 107, 126-27 (1987); United States v. Roane, 378 F.3d 382, 404 (4th Cir. 2004).

In his response to the motion to dismiss, Riner also brings a new subpart to Claim 3 concerning juror misconduct. Specifically, he alleges that Juror Collins "gave false testimony during voir dire and withheld relevant information, that if known, would have disqualified her for cause." (Pet. Resp., 82-84). Riner attempted to raise a similar claim, alleging misconduct by Collins, as Claim G of his state habeas petition, and attempted to raise the issue as an ineffective assistance claim to the Supreme Court of Virginia in his habeas appeal. The circuit court dismissed the claim as procedurally defaulted under Slayton, 205 S.E.2d at 682, because Riner could have raised the claim at trial and on direct appeal, and the Supreme Court of Virginia summarily dismissed Riner's petition for appeal, finding no reversible error in the judgment.[13]

Riner alleged to the state courts that Juror Collins failed to give an accurate response when asked during voir dire if she was related to any parties or witnesses. After studying a list of the 169 possible witnesses in the case, Collins stated that she was related to Wayne and Nancy Wheatley, explaining that they were her grandfather's brother and his wife. (Tr. II: 278). Riner asserts that Nancy Wheatley is Riner's second cousin, which makes Collins related to Riner. (Pet. Resp., 82). During voir dire, however, Collins did not reveal this relationship with Riner.[14] Riner speculated that

---

[13]Riner did not raise an assignment of error in his habeas appeal as to the claim about Collins, although he does attempt to raise an ineffective assistance claim as to "Claim G" and to "incorporate[ ] by reference the arguments and authorities set forth in his habeas petition below."

[14]In answer to questions on jury questionnaire, Juror Collins did not indicate that she knew Riner or Denise or their family members. (Tr. I:140). When jurors were asked in the courtroom if they recognized Riner, Collins did not respond. (Tr. II:85).

31

"[u]nder all the circumstances . . . one can conclude that Collins herself may have been aware of the relationship and hid these facts from the Court." (Hab Pet., 90). Riner asserted that he did not raise this claim on direct appeal because "until now," he "was not aware of all the [related] facts." Id. at 91-92.

In his current submissions, Riner presents "new evidence" in support of this claim. He asserts that Wayne Wheatley told him:

> Collins and her mother were and are close friends with Fredia Helbert, a sister of Denise Riner who was working to get Riner indicted and convicted. Wheatley . . . advised Riner that Collins gained significant amounts of information on Riner's case directly from Helbert, which was one sided, misleading and false and that Collins had already decided that Riner was guilty before the trial even started.

(Pet. Resp. at 82-83). He asserts that if Collins had admitted during trial that she was related to Riner and was acquainted with Helbert, she would not have been allowed to serve on the jury. Wheatley's information "leads Riner to believe that Collins purposely withheld the family information so she could sit on Riner's jury because she was on a mission to [ensure] Riner's conviction." Id. In an effort to develop further evidence on this claim, Riner asks to subpoena Collins to testify under oath. Id. He asserts that this new information supports a claim that she intentionally failed to answer honestly a material question on voir dire, see McDonough v. Greenwood, 464 U.S. 548 (1984), and was biased against him from the start, Irvin v. Dowd, 366 U.S. 717 (1961).

The court concludes that the claim concerning Collins's "false" responses during voir dire must be summarily dismissed as untimely filed in this court. It is clearly untimely under § 2244(d)(1)(A), because Riner did not file this claim within one year of the date on which his conviction became final. Section 2244(d)(1)(D) allows calculation of the filing period beginning on the date when petitioner, acting with due diligence, could have discovered the facts necessary to support the claim. Riner knew from Collins's voir dire responses on October 3, 2000, that she was the great niece of Wayne Wheatley. (Tr. II:278). At the time of trial, he also clearly knew of his own relationship as second cousin to Nancy Wheatley, because he called her in that capacity as a

32

defense witness.[15] (Tr. XVIII:114; XIX:166). Moreover, Riner fails to explain how the Wheatleys knew of Collins's friendship with Denise's sister, Fredia Helbert, or how the Wheatleys learned of Collins's pretrial belief that Riner was guilty. He also fails to explain, given his relationship with the Wheatleys, why he could not have obtained this information from them much earlier, during the state court proceedings. In short, Riner fails to demonstrate why he could not have discovered all of the Collins information in time to bring this claim in his initial federal petition. As the Collins claims rely on a different operative core of facts and legal principles than any of his timely filed claims, they cannot relate back under Rule 15(c)(1)(B). Therefore, the court will dismiss the claims as time-barred under § 2244(d)(1).[16]

## F. ADMISSION OF DOUBLE HEARSAY STATEMENTS

In Riner's initial § 2254 petition, Claim 4 challenges the trial court's admission of testimony from Donna Brickey, a Commonwealth's witness, stating that Denise had told her "[Riner] had told [Denise] that if she tried to leave him that he would take the kids away and she would never see them again" and that "if she tried to leave him and take the kids that he would kill her." (Tr. VI:65-66). Although he does not state a legal basis for this double hearsay claim, the court will liberally construe the petition as raising claims that admitting Brickey's testimony violated Riner's rights under the Confrontation Clause of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment.[17]

Riner presented the double hearsay claim on direct appeal under the state rule that to be admissible, both levels of a double hearsay claim must fall within a recognized exception to the state

---

[15]Based on the state habeas courts' procedural default rulings, this court is also procedurally barred from addressing the merits of the claim that Collins failed to reveal her family relationship with Riner during voir dire. Weeks, 176 F.3d at 270.

[16]Riner's motion seeking an opportunity to depose jurors and obtain an affidavit from Collins will be denied, as the court cannot find cause to allow discovery on defaulted, untimely, or meritless claims. See Rule 6, Rules Governing Section 2254 Proceedings.

[17]To the extent that Riner asserts a claim that the testimony was wrongfully admitted under state law, he has no grounds for federal habeas relief. See Estelle, 502 U.S. at 66-67.

33

rule against hearsay. <u>Riner</u>, 601 S.E.2d at 571. The Supreme Court of Virginia found this claim to be waived, because Riner had failed to ensure that the trial court ruled on his objection as to both levels of the hearsay (Riner's statement to Denise and Denise's statement to Brickey).[18] <u>Id.</u> The court dismissed the state law claim under its contemporaneous objection rule (Rule 5:25). <u>Id.</u> Justice Koontz wrote a dissent on this issue, opining that Riner's objection to half of the double hearsay statement was sufficient to constitute a contemporaneous objection under Rule 5:25 and preserve the issue for appeal. <u>Id.</u> at 575-80. Moreover, Justice Koontz also found that Brickey's testimony was the only evidence presented during the long trial that Riner had threatened to kill Denise; he opined that because such evidence "becomes a lens through which the jury will focus on the evidence and assess the rest of the prosecution's case against the accused," "it cannot be said with fair assurance that the judgment was not substantially swayed" by the erroneous admission of Brickey's double hearsay statement and on that ground, he would have granted Riner a new trial. <u>Id.</u> at 580 (internal quotations omitted). This court need not decide whether the majority on Riner's appeal panel erred in finding this claim procedurally barred, however. To do so would require reexamination of state-court determinations on a state law issue–what constitutes an adequate objection under Virginia law–and in federal habeas review, this court cannot engage in such an exercise. <u>Estelle</u>, 502 U.S. at 67-68.

This court also need not determine whether the procedural rule on which the majority based its decision is an adequate state law ground for dismissal so as to bar review of the federal constitutional claims related to Riner's double hearsay claim, bbecause these claims are procedurally barred on other grounds from review of the merits by this court. The respondent asserts, and the court agrees, that any federal constitutional due process claim related to Brickey's double hearsay is procedurally barred because Riner did not present any such federal claim to the state trial court.

---

[18]Riner argues that the state courts wrongfully "relieved the Commonwealth of its burden" to prove that both levels of the hearsay statement fell within exceptions. (Pet. Resp., 86). He is mistaken. The Supreme Court of Virginia merely held Riner to his obligation to follow through on his objection in order to "afford the trial court the opportunity to rule intelligently on the issue." <u>Riner</u>, 601 S.E.2d at 571.

<u>Duncan</u>, 513 U.S. at 365-366. If Riner presented a federal due process claim now to the state courts, it would be dismissed as procedurally barred under Va. Code Ann. § 8.01-654(A)(2) (statute of limitations) and § 8.01-654(B)(2) (successive petition bar).[19] Thus, the federal due process claim is also procedurally barred from federal <u>habeas</u> review. <u>Gray</u>, 518 U.S. at 162.

Riner presented his Confrontation Clause claim to the Supreme Court of Virginia on direct appeal in a letter brief requested by the court after the issuance of the United States Supreme Court decision in <u>Crawford v. Washington</u>, 541 U.S. 36 (2004) (holding that testimonial out-of-court statements by witnesses are barred, under the Confrontation Clause, unless witnesses are unavailable and defendants had prior opportunity to cross-examine witnesses). Although admitting that Denise's statement to Brickey was not "testimonial" so as to fall within the scope of <u>Crawford</u> itself, Riner argued on appeal that admission of the double hearsay nevertheless violated his rights under the Confrontation Clause because it did not fall within a "firmly rooted hearsay exception" or bear "particularized guarantees of trustworthiness." <u>Ohio v. Roberts</u>, 448 U.S. 56, 66 (1980), <u>abrogated in part by Crawford</u>, 541 U.S. at 68. The Supreme Court of Virginia stated,

> We conclude that Riner waived the constitutional argument he now makes. When he objected to Brickey's testimony at trial, he relied only on state law hearsay grounds in support of his objection. Riner did not mention the Sixth Amendment or the Confrontation Clause. Under this Court's contemporaneous objection rule, <u>see</u> Rule 5:25, we do not consider a constitutional argument raised for the first time on appeal.

<u>Riner</u>, 601 S.E.2d at 572 n.11 (citations omitted). The stated procedural default ground–the state supreme court's contemporaneous objection requirement–has been ruled an adequate and independent state law ground for dismissal of federal claims, and accordingly, this court is procedurally barred from consideration of the claim on the merits. <u>Weeks</u>, 176 F.3d at 270.

In his response to the motion to dismiss, Riner raises two additional, double hearsay claims, concerning testimony by Cheryl Brown and Harriet Cornett . The trial court allowed Cheryl Brown,

---

[19]The Fourth Circuit has held the procedural rules governing Virginia <u>habeas</u> petitions to be adequate grounds to bar federal <u>habeas</u> relief on a constitutional claim. <u>Pope</u>, 113 F.3d at 1372; <u>Gray v. Netherland</u>, 99 F.3d 158, 163 (4th Cir. 1997).

35

the manager of the pawn shop where Riner sold things after the fire, to testify about that transaction, although she herself was not present at the transaction. Riner, 601 S.E.2d at 572. Her testimony centered on shop policies and a pawn shop journal entry written by a shop employee who was not called to testify. Id. Riner objected to admission of Brown's testimony at trial and raised a challenge to the admission on direct appeal under state law only. The Supreme Court of Virginia found no error in the admission. Id. Because he did not present the claim about Brown's testimony as a federal due process claim to the state court, it is procedurally barred from federal review. Duncan, 513 U.S. at 365-366; Gray, 518 U.S. at 162. Riner does not explain in his federal petition what portion of Cornett's testimony he is challenging or why its admission was prejudicial to his case.[20] In any event, as he never presented this claim to the Supreme Court of Virginia, it is procedurally defaulted. Gray, 518 U.S. at 162.

Further, Riner waited too long in the federal habeas proceedings before presenting the hearsay claims concerning the testimony by Brown and Cornett. Although he knew about these claims at the time of trial, he first mentioned them to this court in his January 2008 response to the motion to dismiss, well after his federal filing period under § 2244(d)(1)(A) expired in September 2007. The claims concern different operative facts than did the timely filed claim concerning Brickey's hearsay testimony. Accordingly, these claims do not relate back under Rule 15(c)(1)(B) and will be dismissed, pursuant to § 2244(d)(1)(A).

## G. CHANGE OF VENUE

Riner raised change of venue issues at trial and on direct appeal, as detailed by the Supreme Court of Virginia's opinion. Riner, 601 S.E.2d at 561-63. The Supreme Court of Virginia characterized Riner's change of venue claim as being "three-fold": (1) "the trial court applied an

---

[20] The Commonwealth called Cornett, Denise's co-worker at Medshares, as part of its case in rebuttal. (Tr. XXI:129-38). Cornett testified that shortly before the fire, Denise had told her that after she told Riner she wanted a divorce and wanted him out of the house, Riner "had called and said that he had located an apartment in Norton and that he should have everything out of the home by that following Friday." Id. at 136. Riner admitted during his testimony that he had never looked for or found an apartment in Norton in August 1998 and did not remember telling Denise that he had. (Tr. XVII:115).

improper legal standard [in addressing the motion for change of venue] because it considered only the fact that a jury had been selected rather than "the ease of seating the jury" as required under Virginia precedent; (2) because "prejudicial pre-trial publicity prevented the selection of an impartial jury," the trial court erred in denying his motion for change of venue; and (3) the trial court's denial of the joint motion for change of venue was error, "because the court itself questioned the impartiality of the jury." Id. at 562.

The Supreme Court of Virginia reviewed the pertinent sequence of events. Riner moved before trial for change of venue based on prejudicial pre-trial media coverage; after allowing the parties to gather and submit evidence and conducting hearings on the subject, the trial court took the motion under advisement, stating that if selecting a jury "becomes a problem, then we will change the venue." Id. at 561. Riner's counsel did not object to this action and did not renew the motion for change of venue at the close of voir dire,[21] when the trial court asked for any motions before jury selection. Id. (Tr. IV:145-46).

> However, before the parties exercised their peremptory strikes, a dispute arose concerning whether the Commonwealth would introduce the fact of Riner's trip to Panama as evidence of flight. Riner indicated that he wished to counter any such

---

[21]In his response to the motion to dismiss, Riner claims that the trial court deprived him of a fair trial by refusing to allow counsel to question jurors about pretrial publicity during voir dire. (Pet. Resp., 110). The record refutes this claim. Voir dire included questionnaires filled out by individual members of the venire; counsel then discussed individual questionnaires with the court and questioned individual jurors about their responses. (Tr. IV). During voir dire, defense counsel commented: "Now we know we've got roughly ninety percent (90%) of those jurors checked the yes box on 13-A, that they had read or heard something about the case." (Tr. IV:175). Riner himself admits that the trial court released nearly half of the 200 jurors summoned for Riner's trial "for possible prejudice towards Riner." Although the trial judge stated his intention that the questionnaires be made part of the record (Tr. V:24), this court was unable to locate a copy of the juror questionnaire itself in the records provided; however, the transcripts reflect that it included questions about publicity and that the court allowed defense counsel to question jurors individually about whether they had formed an opinion as to Riner's guilt or innocence and whether they could decide the case based only on the evidence presented to them in the courtroom, despite what they had heard or read in the media (for example, Tr. I:141; Tr. IV:19-20, 24-25).

In any event, Riner's claim alleging wrongful limitations on voir dire questioning was not timely filed in this court under § 2244(d)(1)(A) and relies on a different core of operative facts than do Riner's timely filed claims regarding his requests to change the venue based on pretrial publicity. As the new claim regarding voir dire on pretrial publicity is untimely and does not relate back under Rule 15(c)(1)(B), it will be dismissed. To the extent that Riner is claiming that the court should have allowed voir dire of each juror concerning the content of what he or she had read or heard, he has no constitutional basis for relief under § 2254. See also Mu'Min v. Virginia, 500 U.S. 415, 435-46 (1991) (finding that "content" questions concerning pretrial publicity jurors have read or heard is not constitutionally required).

37

evidence suggesting flight by mentioning in opening statement and by introducing into evidence the fact that he had passed a polygraph test. . . . [He asserted that the successful polygraph demonstrated] a legitimate reason for [his] going to Panama, which would rebut adverse media publicity about the trip.

Id. During this discussion, the trial court stated,

Well, you know, there's no proof that these jurors know about the flight, but down deep in my little heart and my conscience, I know dang good and well they probably know or some of them, if not all of them, some of them know about it and I have a hard time ignoring that fact. I can't ignore it.

Id. (quoting Tr. IV:186-87). The Commonwealth, "out of concern that a ruling by the court to admit the polygraph evidence would be tantamount to a finding that the jury was not impartial" and potentially result in a mistrial, made a conditional motion to join Riner's motion for change of venue; "if the trial court intended to admit evidence about the polygraph because of its perceived 'taint in the community,' then the Commonwealth was prepared to join in Riner's motion for change of venue." Id.. Riner joined this motion, but did not "reiterate or rely upon his previously stated reasons for a change of venue." Id. The trial court overruled the joint motion. (Tr. IV:194-95). After the parties exercised their peremptory strikes, but before the selected jurors were sworn, the court asked whether there were "any preliminary motions before we bring in the jury?" Defense counsel said, "None from the defense." (Tr. V:27).

The Court of Appeals of Virginia had found that Part (1) of this claim was defaulted under its Rule 5A:18, because "Riner did not argue before the trial court that it had applied an improper legal standard when considering the change of venue motion" or object on this ground once the petit jurors were selected. Riner, 601 S.E.2d at 562. The Supreme Court of Virginia found Part (1) defaulted under its Rule 5:17(c), because Riner did not include in his assignments of error a challenge to the Court of Appeals' default ruling on this issue. Id. As these state procedural rules are independent and adequate state grounds for dismissal of any federal due process claim regarding the standard the trial court used, Riner's defaults bar his claim from federal habeas review on the merits. See Mueller v. Angelone, 181 F.3d 557, 582-84 (4th Cir. 1999) (finding Va. Sup. Ct. Rule 5:17(c) to be independent and adequate state law ground for dismissal of constitutional claim as

applied to bar claims appellant failed to list as assignments of error and argue in brief)(citing other cases).

The Supreme Court of Virginia also found that Riner had "defaulted his challenge to the trial court's denial of his change of venue motion" asserting that "adverse pretrial media coverage" would prevent him from having a fair trial. Riner, 601 S.E.2d at 562. The Supreme Court's ruling on this portion of Riner's claim was based on a finding that "Riner did not renew his change of venue motion or remind the trial court that it previously had taken the motion under advisement" when voir dire was completed, before peremptory strikes, or before the jurors were sworn. Id. Under Virginia law, it is "incumbent upon [the defendant] to renew the motion [for change of venue] before the jury was empaneled and sworn, or at least remind the court that it was still pending." Id. (quoting Green v. Commonwealth, 580 S.E.2d 834, 842 (Va. 2003)). Because Riner had not requested a ruling on his previous venue objection, the Supreme Court found the claim waived under its Rule 5:25. Id. This state procedural rule is an independent and adequate state law ground barring this court from review of any federal claim related to Riner's motion for change of venue based on adverse pretrial media coverage. Weeks, 176 F.3d at 270.

The third portion of Riner's venue claim, regarding the trial court's denial of the joint motion, the Supreme Court adjudicated on the merits, citing state law. Riner, 601 S.E.2d at 563. Before the parties exercised peremptory strikes,

> The Commonwealth wanted a change of venue only if the trial court, concerned that some of the jurors probably knew about Riner's trip to Panama, intended to allow Riner to introduce evidence that he had passed a polygraph test. In other words, the Commonwealth was amenable to a change of venue for the sole purpose of eliminating the trial court's rationale for allowing Riner to introduce evidence about the polygraph test. Riner initially objected to the basis of the Commonwealth's motion but eventually decided to join it [without renewing any of his own grounds for requesting change of venue].

Id. at 563. In dismissing this claim, the Supreme Court of Virginia applied a rebuttable presumption that a defendant can receive a fair trial in the jurisdiction where the offense conduct occurred. Id. The state court did not interpret the trial judge's statement about the Panama evidence as proof of

39

a question in the court's mind about the jurors' impartiality. Instead, the trial court merely indicated that, when deciding whether Riner could introduce evidence that he had passed the polygraph test, it could not ignore the fact that some jurors probably knew about the Panama trip. The trial court's statement was not a finding that the jurors in fact had this knowledge and could not ignore it, or that the jury was not impartial.

Id. Thus, the state court found that the reason behind the joint motion for change of venue–"avoid[ing] an anticipated evidentiary ruling" on the polygraph evidence–was not sufficient to rebut the presumption that Riner could receive a fair trial in Wise County. Id.

"The constitutional standard of fairness requires that a defendant have a panel of impartial, indifferent jurors." Irvin, 366 U.S. at 722 (internal quotations omitted). The sheer volume of publicity surrounding a trial does not, in itself, create any presumption that the defendant's due process rights to a fair trial have been compromised.[22] Murphy v. Florida, 421 U.S. 794, 799 (1975). Even if jurors have been exposed to publicity about the case and hold some "preconceived notion" of the defendant's guilt or innocence, "[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." Id. (quoting Irvin, 366 U.S. at 723). Jurors' assurances of impartiality are not dispositive of the issue, however. "[T]he test is whether the nature and strength of the opinion formed are such as in law necessarily . . . raise the presumption of partiality. The question thus presented is one of mixed law and fact." Irvin, 366 U.S. at 723. The trial court has broad discretion, based on his own perceptions of the depth and extent of news stories that might influence a juror," to conduct voir dire proceedings geared to determine

---

[22]Earlier cases had found that the setting of the trial, including media coverage, can be inherently prejudicial. See Sheppard v. Maxwell, 384 U.S. 333, 362 (1966) (finding presumption of prejudice arising from inflammatory publicity and distracting presence of media personnel in courthouse); Rideau v. Louisianna, 373 U.S. 723, 726-27 (1963) (finding presumption of community prejudice from fact that local television station repeatedly broadcast defendant's filmed confession). In the Murphy decision, the Supreme Court greatly limited the application of these decisions to their facts, stating:

> The proceedings in these cases were entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of a mob. They cannot be made to stand for the proposition that juror exposure to information about a state defendant's prior convictions or to news accounts of the crime with which he is charged alone presumptively deprives the defendant of due process.

421 U.S. at 799. The key inquiry regarding a venue change issue is whether there exist "any indications in the totality of circumstances that petitioner's trial was not fundamentally fair." Id. at 798-99.

if prospective jurors could remain impartial despite pretrial publicity and decide the case only upon the evidence presented to them during trial. Mu'Min, 500 U.S. at 427. A trial judge's decision that jurors can be impartial, based on their voir dire testimony, "should be set aside only where prejudice is "manifest." Irvin, 366 U.S. at 724.

Riner argues that in stating his own belief that jurors had heard about Riner's "flight" to Panama, the trial judge essentially made a finding that the jury pool was so tainted by pretrial publicity that jurors could not decide the case based on the evidence presented to them and so erred in denying the joint motion for change of venue. The Supreme Court of Virginia expressly found that the trial judge's statement did not constitute such a finding and that the statement taken in context as part of the polygraph evidence discussion, merely supported his ultimate rulings allowing testimony about the polygraph results. Riner, 601 S.E.2d at 563. The state court also found that the only ground argued in support of the joint motion for change of venue was the Commonwealth's desire to avoid an evidentiary ruling to allow admission of polygraph results. Id. Transcript review of the lengthy discussions the attorneys and the judge had about the polygraph evidence are consistent with the Supreme Court of Virginia's findings. Yes, Riner's earlier motions seeking a change of venue included documentation of pretrial publicity about his case that was extensive and sometimes inaccurate and inflammatory. It is undisputed, however, that he did not present any such evidence during the discussion of the joint motion. (Tr. IV: 194).

Moreover, although the Supreme Court of Virginia did not cite any federal precedent in deciding this claim, its analysis stressed the principles set forth in the controlling United States Supreme Court decisions and its conclusion is consistent with such federal precedent. Early v. Packer, 537 U.S. 3, 8 (2002) (per curiam) (finding that state court's decision need not cite or even be aware of United States Supreme Court precedent in order to survive scrutiny under § 2254(d)). In support of the joint motion for change of venue, the parties did not demonstrate that jurors had been so tainted by pretrial publicity that they could not ignore any knowledge they had gained about the case and decide the issues based on the evidence presented in court. Accordingly, they failed to

prove that the trial judge abused his discretion in denying the motion. As this court finds that the state court's disposition of this mixed question of law and fact was not contrary to or an unreasonable application of federal law or based on an unreasonable determination of fact, the court must dismiss this claim under § 2254(d).

## H. INEFFECTIVE ASSISTANCE OF COUNSEL

As stated, a federal habeas court is barred from review of constitutional claims when a state court has refused to consider their merits based on an adequate and independent state procedural rule. See Harris, 489 U.S. at 262. A state court's finding of procedural default that rests on a determination of state law is not reviewable in federal habeas proceedings. Burket v. Angelone, 208 F.3d at 184; Estelle, 502 U.S. at 67-68. The independence and adequacy of the state law are federal questions, however. Lee v. Kemna, 534 U.S. 362, 375 (2002). A state procedural rule is "adequate" if it is regularly or consistently applied by the state court, see Johnson v. Mississippi, 486 U.S. 578, 587 (1988), and is "independent" if it does not "depend[ ] on the determination of whether federal constitutional error has been committed," Ake v. Oklahoma, 470 U.S. 68, 75 (1985). Ordinarily, "firmly established and regularly followed state rules . . . will be adequate to foreclose review of a federal claim." Lee, 534 U.S. at 376. In "exceptional cases," however, "exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question." Id.

Riner's assertions of ineffective assistance, designated as Claim 6 in the federal petition, were presented to the circuit court in the state habeas proceedings. The circuit court addressed the ineffective assistance claims on the merits and found no grounds for relief under Strickland v. Washington, 466 U.S. 668, 694 (1984) (holding that ineffective assistance of counsel claim requires showing of "reasonable probability" that but for counsel's unprofessional errors, result reached by reasonable and impartial fact finder would have been different). Riner appealed the circuit court dismissal order to the Supreme Court of Virginia, pursuant to Virginia Code Ann. § 17.1-406(B). In an interlocutory order dated February 23, 2007, the Supreme Court of Virginia ruled that

42

> Assignment of Error 6 [alleging ineffective assistance of counsel] does not
> sufficiently comply with the requirements of [Supreme Court of Virginia Rule]
> 5:17(c). The appellant attempts to incorporate by reference various arguments and
> authorities set forth in the petition for a writ of habeas corpus that he filed in the
> circuit court. We have previously held that such a practice is impermissible. . . . The
> Court will not consider such arguments and they are deemed waived. Accordingly,
> the Court dismisses this assignment of error. The appeal shall remain pending with
> regard to assignments of error 1 through 5.

The Court summarily rejected Riner's later attempts to challenge the interlocutory ruling.
Ultimately, the Supreme Court of Virginia dismissed assignments of error 1 through 5 as
procedurally barred under <u>Slayton</u>, 205 S.E.2d at 682, because the claims should have been raised
on direct appeal.

The Supreme Court of Virginia's Rule 5:17(c) concerns the required form and content of a
petition for appeal in that court. The rule provides in pertinent part that

> [u]nder a separate heading entitled "Assignments of Error," the petition shall list the
> specific errors in the rulings below upon which the appellant intends to rely. Only
> errors assigned in the petition for appeal will be noticed by this Court. . . . An
> assignment of error which merely states that the judgment or award is contrary to the
> law and the evidence is not sufficient. If the petition for appeal does not contain
> assignments of error, the appeal will be dismissed.

Sup. Ct. Va. R. 5:17(c). In its subsections (3) and (4), the rule also requires that a petition for appeal
must include a statement of the facts and the law in support of each assignment of error. <u>Id.</u> Rule
5:17(c)(5) provides that a petition for appeal shall not exceed 35 typed pages.

Respondent argues that the state court's application of Rule 5:17(c) is an independent and
adequate state law ground for dismissal, barring federal review of Riner's ineffective assistance
claims. Riner argues that he substantially complied with Rule 5:17(c), that the rule itself does not
require strict compliance, that neither the rule nor case law requires "flawless compliance with Rule
5:17(c)," and that his failure to comply with Rule 5:17(c) should have been excused because his case
was so "extraordinarily lengthy and complex" that he could not have offered complete arguments
in his appeal brief, while conforming to the 35-page limit set in Rule 5:17(c)(5). He also argues that
Rule 5:17(c) is inadequate to bar federal <u>habeas</u> relief because no previous Virginia case had applied
the rule to dismiss claims under specifically the same circumstances as present in his case and

Case 7:07-cv-00455-JCT-mfu   Document 42   Filed 09/26/08   Page 43 of 53   Pageid#: 642

because the Supreme Court of Virginia used Rule 5:17(c) on an interlocutory basis while his other claims were still pending (and rejected his attempts to correct the deficient brief) in order to avoid having to grant relief on grounds of ineffective assistance that the court had already identified on direct appeal. Riner's arguments fail.

First, the Supreme Court of Virginia's dismissal order expressly finds that Riner's degree of compliance with Rule 5:17(c) was not sufficient. A federal court cannot second guess this determination of state law by the state's highest court. Burket, 208 F.3d at 184; Estelle, 502 U.S. at 67-68. In any event, the court cannot agree that Riner substantially complied with the rule. Assignment of Error 6 of Riner's habeas appeal petition to the Supreme Court of Virginia stated only a general claim of ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668, but did not allege specific instances of deficient performance or resulting prejudice. Failure to state specific assignments of error as to each of counsel's alleged deficiencies did not comply with the plain language of Rule 5:17(c), requiring that appellant list "specific errors in the rulings below upon which the appellant intends to rely." Counsel then listed the individual claims of ineffective assistance in the text of the habeas appeal brief, but did not include any facts or argument pertinent to the claims; instead, he sought to incorporate by reference the ineffective assistance arguments made in the habeas briefs submitted to the circuit court. This attempted shortcut did not comply with the plain language of Rule 5:17(c)(3) & (4) (requiring that facts and law in support of each claim must be included in the brief). Even if the statement of the claims in the brief and the incorporation of arguments from the lower court record might be deemed substantial compliance with the rule, Rule 5:17(c) does not make any exceptions for "substantial compliance."

Second, the court finds that Rule 5:17(c) is independent and adequate to bar federal habeas review of Riner's ineffective assistance claims. The rule is independent, as the state court's application of the rule did not depend on "the determination of whether federal constitutional error ha[d] been committed." Ake, 470 U.S. at 75. The requirements of Rule 5:17(c) are unambiguous and had been regularly enforced, and such rules are generally adequate to bar federal habeas review

even if the rule has not yet been applied to a case with identical facts. Yeatts v. Angelone, 166 F.3d 255, 263-64 (4th Cir. 1999) (noting that "[t]he Supreme Court of Virginia had applied [Rule 5:17(c)] numerous times prior to the date Yeatts filed his petition for appeal to refuse to address issues that were not preserved properly with specific assignments of error"). Thus, the fact that the state failed to cite any previous case in which claims were dismissed under Rule 5:17(c) by interlocutory order rather than in the final order does not prevent the rule from being adequate to bar federal review. Moreover, contrary to Riner's assertions, the Supreme Court of Virginia had applied Rule 5:17(c) in circumstances quite similar to Riner's case, where the appeal petition failed to state specific assignments of error for each instance of alleged ineffective representation. See, e.g., Yeatts v. Murray, 455 S.E.2d 18, 21-22 (Va. 1995). After his state habeas claims of ineffective assistance with regard to his capital murder trial and sentencing were dismissed on the merits by the trial court, the petitioner in the Yeatts case raised them on appeal; the Supreme Court of Virginia refused to consider the merits of his claims because they were not "the subject of an assignment of error" as required under Rule 5:17(c). Id. at 21. The court noted:

> Yeatts' assignment of error touching [the issue of ineffective assistance] merely states that the habeas court erred by dismissing the petition "without ordering an evidentiary hearing as to his allegations of ineffective assistance of counsel." This assignment of error only challenges the alleged procedural failure to order an evidentiary hearing; it does not challenge, with reasonable certainty, the habeas court's substantive ruling on the merits of the ineffective assistance claims.

Id. at 21-22.[23] Similarly, Riner's assignment of error alleging general ineffective assistance of counsel failed to comply with Rule 5:17(c), because it did not challenge, individually, the trial court's substantive rulings on each alleged instance of counsel's deficient performance and prejudice. See also Hedrick v. True, 443 F.3d 342, 360 (4th Cir. 2006) (finding Rule 5:17(c) adequate to bar federal habeas where Supreme Court of Virginia applied rule to dismiss habeas claim raised in petitioner's amendment, but not in his opening brief).

---

[23]Unlike Riner, the petitioner in Yeatts included argument on the ineffective assistance issues in his appeal brief, although he was challenging a capital murder conviction and death sentence involving many complex issues. Id. at 21.

45

It was also well established at the time of Riner's trial that an appellate brief incorporating by reference the arguments presented in trial briefs was not sufficient under Rule 5:17(c) and that claims so presented would be considered waived. See Swisher v. Commonwealth, 506 S.E.2d 763, 767 (Va. 1998) (quoting Spencer v. Commonwealth, 393 S.E.2d 609, 622 (Va. 1990) ("An appellant who asserts that a trial court's ruling was erroneous has an obligation to state clearly to the appellate court the grounds for that assertion. A cross-reference to arguments made at trial is insufficient."); Mueller v. Angelone, 181 F.3d 557, 584 (4th Cir.1999) (finding that the petitioner's procedural default under Rule 5:17(c) for failure to brief issues that were designated as assignments of error was an adequate state ground to foreclose review of the federal claim). See also Muhammad v. Commonwealth, 619 S.E.2d 16, 31 (Va. 2005) (finding state habeas claims waived because merely restating assignment of error in text of appeal brief and making reference to pages in appendix where trial court arguments could be found was not compliant with Rule 5:17(c)).

Third, the court finds no indication that the Supreme Court of Virginia's summary dismissal of Riner's ineffective assistance claims in an interlocutory order represents an "exorbitant application" of Rule 5:17(c). Lee, 534 U.S. at 376. As stated, the rule sets unambiguous format requirements, and Riner's petition did not comply with those requirements in several respects as to his ineffective assistance claims. These claims were, therefore, dismissable under Rule 5:17(c) without consideration of the lower court record or additional argument from the parties. The delay in issuance of the final order as to the rest of Riner's claims indicates the state court's willingness to consider fully the portion of the petition that did comply with Rule 5:17(c). Furthermore, the rule serves important court interests in judicial efficiency, requiring appellant's brief give a clear statement of the lower court rulings under challenge and a concise (35 pages, maximum), focused statement of the argument and facts on which the party believes the lower court's ruling was reversible error. Allowing any exception to the form requirements, such as amendments or incorporating lower court documents, would dilute the efficacy of the rule in furthering these interests.

46

Finally, the record does not support Riner's argument that the Supreme Court of Virginia used Rule 5:17(c) illegitimately in order to avoid an inevitable grant of relief on counsel's errors noted during direct appeal. The court made no findings during the appeal proceedings that counsel provided ineffective assistance at trial; indeed, such claims are not cognizable on direct appeal. See Lenz v. Commonwealth, 544 S. E. 2d 299, 304 (Va. 2001) (claims raising ineffective assistance of counsel in Virginia criminal case must be asserted in habeas; such claims not cognizable on direct appeal). Although the Supreme Court found that some of Riner's appellate claims were waived because counsel failed to preserve issues properly, none of these findings is tantamount to a determination that counsel's failure to make or pursue certain trial objections was constitutionally significant error on which Riner would be entitled to habeas relief under Strickland's two-prong standard of deficient performance and prejudice. 466 U.S. at 694. Riner fails to prove that the Supreme Court of Virginia applied Rule 5:17(c) for any reason other than the interests the rule furthers in bringing before the court only those claims that are properly identified and argued as appellate issues.

For the stated reasons, the court finds that the Supreme Court of Virginia's application of Rule 5:17(c) to Riner's ineffective assistance claims was an independent and adequate state law ground for dismissal so as to bar federal habeas review of his claims on the merits. Unless Riner can show cause and prejudice or a miscarriage of justice, these claims will be dismissed.

## I. CAUSE AND PREJUDICE

A federal court may review procedurally defaulted claims or evidence only if petitioner shows cause for the default and resulting prejudice or shows that a grave miscarriage of justice will result if the claim is not considered. See Coleman v. Thompson, 501 U.S. 722, 750 (1991); Murray v. Carrier, 477 U.S. 478, 488 (1986). To show cause for a default, a petitioner must demonstrate "that some objective factor external to the defense impeded counsel's efforts to raise the claim at an earlier stage in compliance with the state's procedural rule" or that the factual basis for his claim was not available to him when he filed his state habeas petition and that he could not have discovered it

47

through reasonably diligent investigation. <u>Strickler v. Green</u>, 527 U.S. 263, 283 (1999) (<u>quoting</u> <u>Murray</u>, 477 U.S. at 488). Errors of counsel may also serve as cause to excuse the procedural default of a specific constitutional claim, but only if petitioner demonstrates (1) that the errors were so egregious that they violated petitioner's constitutional right to effective assistance of counsel, and (2) that the ineffective assistance claim itself is exhausted and not procedurally defaulted. <u>Edwards</u> <u>v. Carpenter</u>, 529 U.S. 446, 451-52 (2000). In addition to cause for the default, the petitioner must demonstrate actual prejudice. <u>See</u> <u>Mickens v. Taylor</u>, 240 F.3d 348, 356 (4th Cir.2001) (en banc), aff'd, 535 U.S. 162 (2002).

Riner argues that numerous, alleged instances of ineffective representation by trial counsel should serve as cause to excuse the procedural defaults identified by the state courts on appeal. To the extent that Riner presented his ineffective assistance claims to the state courts in <u>habeas</u> proceedings, the claims are exhausted, pursuant to § 2254(b). However, as discussed, the Supreme Court of Virginia dismissed the ineffective assistance claims under its Rule 5:17(c), an independent and adequate state law ground for dismissal. As the ineffective assistance claims are themselves procedurally defaulted, they cannot serve as cause to excuse Riner's procedural default of any other substantive claims. <u>Edwards</u>, 529 U.S. at 451-52. Riner does not argue any other cause for his procedural defaults.

## J. ACTUAL INNOCENCE

The miscarriage of justice exception to procedural default has been narrowly defined to require a colorable claim that if jurors had received specific, reliable evidence not presented at trial, "it is more likely than not that no reasonable juror would have convicted" the defendant of the underlying crime. <u>Bousley v. United States</u>, 523 U.S. 614, 623 (1998), <u>citing</u> <u>Schlup v. Delo</u>, 513 U.S. 298, 326-27 (1995). Such a showing of actual innocence can serve as a gateway through which a <u>habeas</u> petitioner may pass to have his otherwise procedurally barred, constitutional claims considered on the merits. <u>Herrera v. Collins</u>, 506 U.S. 390, 404 (1993). On the other hand, a claim

48

of actual innocence based on newly discovered evidence is not an independent ground for federal

habeas relief.[24]  Id. at 400; Royal v. Taylor, 188 F.3d 239, 243 (4th Cir. 1999).

"[P]etitioner's showing of innocence is not insufficient solely because the trial record

contained sufficient evidence to support the jury's verdict." Schlup, 513 U.S. at 331.

> In assessing the adequacy of petitioner's showing, . . . the district court is not bound
> by the rules of admissibility that would govern at trial. . . . The habeas court must
> make its determination concerning the petitioner's innocence in light of all the
> evidence, including that alleged to have been illegally admitted (but with due regard
> to any unreliability of it) and evidence tenably claimed to have been wrongly
> excluded or to have become available only after the trial.

Id. at 328 (citations and internal quotations omitted).  The new evidence may be "exculpatory

scientific evidence, trustworthy eyewitness accounts, or critical physical evidence–[information or

testimony] that was not presented at trial."  Id. at 324.  "The court's function is not to make an

independent factual determination about what likely occurred, but rather to assess the likely impact

of the evidence on reasonable jurors." House v. Bell, 547 U.S. 518, 538 (2006).

> Because a Schlup claim involves evidence the trial jury did not have before it, the
> inquiry requires the federal court to assess how reasonable jurors would react to the
> overall, newly supplemented record. . . If new evidence so requires, this may include
> consideration of "the credibility of the witnesses presented at trial."

Id. at 538-39 (citations to Schlup omitted).

Riner seeks to develop two pieces of "new evidence" in support of his actual innocence

argument: (1) a February 2002 news article stating that a certain brand and model of "baseboard

heaters had been found to be short circuiting and starting fires"; and (2) a Cable News Network

("CNN") television show, aired on June 8, 2007, entitled "Justice on Trial: Arson and Science,"

reporting on how arson experts John Lentini and Doug Carpenter were "scientifically proving" that

other arson experts erroneously rely on burn patterns on the floor of structure fire scenes to conclude

that a fire was arson.  (Pet. Resp., 47-48 & Exh. 27).  The court concludes that this evidence does

not qualify as "new evidence" showing actual innocence under Schlup.  513 U.S. at 326-27.

---

[24]"This rule [that actual innocence is not a habeas claim] is grounded in the principle that federal
habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution–not to correct
errors of fact." Herrera, 506 U.S. at 400.

Published in the February 2, 2002, edition of the <u>Roanoke Times</u> newspaper, the article in question states that a Massachusetts company, Honeywell Consumer Products, recalled 450,000 HZ-514 HCP baseboard heaters sold between October 1997 and January 2001. (Pet. Resp., Ex. 27, 2). According to the article, the company recalled the heaters after receiving "53 reports of the moveable heaters short-circuiting, including two cases where fire damaged the floor beneath the heater." Riner requests assistance to determine whether the baseboard heaters in the remains of the Riner house are subject to the HZ-514 HCP recall; he states that the scene has been preserved as evidence, pursuant to trial court order. The recalled heaters date back to October 1997, and the fire occurred on August 12, 1998. Riner has presented no evidence, however, indicating that he and Denise purchased or installed any new, movable baseboard heaters during this ten-month period. Thus, the court cannot find that Riner has met his burden to make a substantial showing that this "new evidence"–facts about the recall or the results of further investigation of the heaters in the burned house[25]–would make it more likely than not that no reasonable juror would find him guilty of arson as required under <u>Schlup</u>.

Riner states that the CNN show "detailed the work of [Lentini and Carpenter] in reviewing arson convictions wherein they were scientifically proving that arson investigators were erroneously concluding that fires were arson by using burn patterns as the basis for their opinion."[26] To develop this evidence, Riner seeks financial assistance, appointment of counsel, a subpoena to obtain a tape

---

[25]Riner also wants to "subpoena the Consumer Products Safety Commission and Honeywell Consumer Products Company to get more details and information." His mere speculation that such a subpoena would lead to evidence of actual innocence is insufficient to warrant further development of this evidence.

[26]In his Motion for Financial Assistance (Dkt. No. 18), Riner seeks appointment of an investigator to find and obtain affidavits from state police special agents, two ATF agents, and a former FBI agent who investigated the fire scene. Presumably, Riner speculates that opinions from these individuals will provide additional "new evidence" that he is actually innocent of arson. For the reasons stated here, additional opinions about the fire evidence are not "new evidence" within the meaning of <u>Schlup</u>. In any event, as these individuals were not called as witnesses for either side at trial, their opinions on the fire's cause and origin would be, at best, cumulative of the trial evidence.

50

of the show, appointment of an investigator, and an evidentiary hearing. Moreover, he wants Lentini and Carpenter to review the fire scene evidence. (Dkt. Nos. 18:3-4; 35:3-5).

The subject matter of this television show is not "new evidence" for purposes of a Schlup analysis. At the most, the kind of scientific proof Lentini and Carpenter are offering is evidence that an accidental fire can cause the same type of burn patterns on which some arson investigators rely to find that a fire was arson. Such evidence would be merely cumulative of the defense case presented at Riner's trial. The state's fire experts, Walker and Davenport, relied on burn patterns and other evidence to find that the Riner fire had been set. As discussed at length with regard to Riner's claim that the evidence of arson was insufficient to support his conviction, Riner called numerous witnesses with experience in assessing fire scenes. All of them (and one of the Commonwealth's own witnesses) found that they could not determine the cause of the fire through their examination of the debris. At least two of these experts, DeHaan and Roby, explained in detail why all of Walker's and Davenport's conclusions drawn from the fire debris evidence could be wrong, because the same features could also have been caused by an accidental fire. Two additional experts' opinions about these same fire phenomena are simply not "new evidence" under Schlup, even if these experts were to apply their theories to Riner's case.[27] See Stewart v. Angelone, 149 F.3d 1170, *4 (4th Cir. 1998) (unpublished) (citing Bannister v. Delo, 100 F.3d 610, 618 (8th Cir. 1996) ("putting a different spin on evidence that was presented to the jury does not satisfy the requirements set forth in Schlup.").[28] Moreover, testimony from additional experts about the fire scene could do little to affect jurors' assessment of Riner's own credibility, which was another factor they reasonably considered in reaching their verdict on the arson evidence.

---

[27]The record indicates that an arson expert named Doug Carpenter examined the Riner fire scene with Richard Roby in February 2000. (Tr. XX:68). Roby testified that Carpenter was a partner of his at Combustion Science and Engineering, Inc. at that time. Id.

[28]Cf. Jones v. Delo, 56 F.3d 878, 883 (8th Cir. 1996) (mental health experts who had testified at trial that defendant was capable of deliberation and then changed their opinions to conclude on habeas review that defendant suffered from an organic brain disease at the time of the offenses was found to be "new evidence").

For the reasons stated, the court concludes that Riner fails to make a sufficient showing of actual innocence of arson under the Schlup standard. As Riner fails to show actual innocence, the court cannot consider the merits of his procedurally defaulted claims and finds that no further discovery or development of evidence in support of these claims is warranted.[29] Schriro, 127 S. Ct. at 1940 (finding that if record precludes habeas relief, federal habeas court not required to hold evidentiary hearing). Therefore, the court will deny Riner's motions for discovery, financial assistance, appointment of an investigator, and an evidentiary hearing.

# IV. CONCLUSION

After careful review of the record and Riner's submissions, the court finds no ground on which he is entitled to habeas relief under § 2254. For the stated reasons, the court will grant the motion to dismiss and dismiss the petition in its entirety. As Riner has not alleged facts warranting

---

[29]Riner's pending motions seek development of evidence in support of his procedurally defaulted, ineffective assistance of counsel claims, as follows:
1.     In support of Claim 6(a) and 6(c), Riner seeks to:
    a.     interview Joseph Carico, the prosecutor; Greg Kallen, the former Wise County Commonwealth's Attorney; employees of Carico's former law firm; and others regarding deals Carico allegedly made with the victim's family to indict Riner in exchange for political support in the Wise County Commonwealth's Attorney election in early 2000. In that election, Carico ousted Kallen, who had believed during his tenure that the evidence was insufficient to convict Riner. Within a few weeks of taking office, Carico sought, and the grand jury returned, an indictment charging Riner for arson and murder. (Pet. Resp., 128-30; Dkt. No. 10:4-7; Dkt. No. 35:7-10);
    b.     investigate whether Carico took a job in the Attorney General's Office after Riner's conviction in order to influence adversely the decision of the Court of Appeals in Riner's case. (Dkt. No. 34:3-4);
    c.     subpoena insurance records related to a claim made by the victim's family that was denied based on an unknown breach of policy terms; Riner believes that the breach concerned the Ringleys' alleged involvement in urging Commonwealth's Attorney Carico to indict Riner. ( Pet. Resp., 130; Dkt. No. 18:4-7); and
2.     In support of Claim 6(e), Riner seeks to investigate the trial judge's personal friendship and family vacations with Harold and Alma Jean Ringley as evidence that the judge could not be impartial in presiding over Riner's case. Harold's brother, Greg Ringley, is married to the victim's sister, Cheryl Ringley, and Greg and Cheryl Ringley were most supportive of the prosecution of Riner's case. (Pet. Resp., 130-133; Dkt. No. 35:10).

Case 7:07-cv-00455-JCT-mfu   Document 42   Filed 09/26/08   Page 52 of 53   Pageid#: 651

an evidentiary hearing or relief, the court finds that his motions for appointment of counsel must be denied.[30] An appropriate order shall be issued this day.

The petitioner is advised that he may appeal this decision, pursuant to Rules 3 and 4 of the Federal Rules of Appellate Procedure, if a circuit court of appeals justice or this court issues a certificate of appealability, pursuant to 28 U.S.C. § 2253( c). A certificate of appealability may issue only if the applicant has made a substantial showing of the denial of a constitutional right. § 2253(c)(1). Petitioner has failed to demonstrate "a substantial showing of the denial of a constitutional right." Therefore, the court declines to issue any certificate of appealability pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure. See Miller-El v. Cockrell, 537 U.S. 322 (2003); Slack v. McDaniel, 529 U.S. 473 (2000). If petitioner intends to appeal to the United States Court of Appeals for the Fourth Circuit, petitioner must file a notice of appeal with this court within 30 days of the date of entry of this opinion and the accompanying final order, or within such extended period as the court may grant pursuant to Rule 4(a)(5).

The Clerk is directed to send copies of this memorandum opinion and accompanying order to petitioner and to counsel of record for the respondent.

ENTER: This 26th day of September, 2008.

Senior United States District Judge

---

[30]See 18 U.S.C. § 3006A(a)(2)(B) (authorizing appointment of counsel in § 2254 case only "if interests of justice so require"); Rule 8(c) of the Rules Governing §2255 Proceedings (requiring appointment of counsel for petitioner if § 2254 case is set for hearing).

53